No. 64,815

S<small>TATE</small> OF K<small>ANSAS</small>, *Appellee/Cross-Appellant*, v. J<small>OHN</small> W<small>ILLIAM</small>, *Appellant/Cross-Appellee*.

(807 P.2d 1292)

Opinion filed March 1, 1991.

*Rebecca E. Holihan*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the briefs for appellant/cross-appellee.

*James E. Flory*, district attorney, argued the cause, and *Frank D. Diehl*, assistant district attorney, and *Robert T. Stephan*, attorney general, were with him on the brief for appellee/cross-appellant.

*Edward G. Collister, Jr.*, of Collister & Kampschroeder, of Lawrence, was on the brief for *amicus curiae*.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, John William, from his conviction for first-degree murder in connection with the death of Richard Settlemyre, a nine-year-old boy.

William raises seven issues on appeal, and the State cross-appeals concerning the exclusion of evidence seized without a

warrant from defendant's personal possessions held by jail personnel while the defendant was incarcerated.

William's issues are in three areas. He contends the evidence is insufficient to support felony murder and, as a result, the general verdict finding him guilty of first-degree murder must be set aside. He challenges the admissibility of confessions and other incriminating statements he made to law enforcement officers for reasons ranging from the officers' failure to give a timely *Miranda* warning and being coerced to confess to being incompetent to give a confession. His final issues deal with his competency to stand trial and his sanity at the time the crime was committed.

The defendant, John William, was 29 years of age when Richard Settlemyre was killed and mutilated. William has had a lifelong history of mental illness.

William had been a homeless transient for many years and had established a campsite on the west bank of the Kansas River under the Kansas Turnpike bridge. On July 12, 1988, Richard left his home, accompanied by William. William had asked Richard's father's permission to take Richard fishing. William had become acquainted with the Settlemyre family the previous year and had frequently played with the Settlemyre children and taken them fishing. William, when playing with the boys, would occasionally tie them up and see if they could escape. Sue Ann Settlemyre, Richard's mother, described William as child-like, as did all the nonexpert witnesses who knew William.

When Richard left, his father instructed William to have Richard home by 7 p.m. Richard's mother returned home on the following afternoon, and Richard had not returned. On the morning of July 14, she went to the police station to report Richard missing.

A search party was organized along the Kansas River, where William and Richard were known to have fished. Detectives Davis and Haller, who were investigating the disappearance, observed William walking by the river near the Kansas Turnpike bridge at 10:30 a.m. Detective Davis called to William, and William came over, handed the officers a hunting knife, and stated, "Here, I suppose I ought to give you this."

Detective Davis informed William that Richard was missing. William told the officers that he and Richard had gone fishing

together on July 12, but that he walked Richard home around 7 p.m. on that day.

According to Davis, William "readily expressed a desire to help in any way he could." William told the officers where one of his campsites was upriver. Davis went with William to locations where William and Richard had gone fishing and dug worms. William then showed Davis the route that he claimed he and Richard had followed as he took Richard home.

At about noon, the detectives went to the Douglas County Law Enforcement Center in order to interview William. On the way, William said he was hungry, and they all stopped at a convenience store. William went in alone while the officers waited in the car. They arrived at the Law Enforcement Center at 12:07 p.m. Davis testified that he did not consider William to be in custody and that William appeared to be normal and relaxed.

At the Law Enforcement Center, Detectives Davis and Haller interviewed William about what had happened on July 12. During the interview, the detectives asked William what had happened to the clothes he had been wearing on that day. William told the officers that he had given them to a lady who did his laundry. He said he would meet her along the trail by the river and she would take his clothes, wash them, and return them to a place on the trail. William then suddenly switched subjects and started talking about someone having been accosted along the river earlier that year.

At 1:48 p.m., the interview ended. William was given food. Davis called a police department in Texas and learned that William had been in several institutions in Texas and had been the subject of an investigation into the death of a young male there.

Davis said of this break in the interview that William "did not ask to leave and we did not encourage him to leave."

At 2:47 p.m., William left with the detectives to go to some other places where he and Richard had gone. At about 3:30 p.m., William suddenly began talking about an attack on someone, which was totally unrelated to the conversation at hand.

At 3:47 p.m., the detectives and William returned to the Law Enforcement Center. William was interviewed by Haller until 4:45 p.m., when Haller accompanied William to the restroom; they returned to the interview room at 5 p.m. During this period,

William told the officers that he had grown very attached to Richard. Suddenly, William changed the subject and started talking about how his natural mother had tried to kill him when he was a child.

At about 6:50 p.m., Davis received word that a child's body had been found in the river. Davis was not informed of the condition of the body until later. Davis returned to the interview room shortly after 7 p.m. and read William his *Miranda* rights. After reading William his rights, Davis asked William if he understood his rights. William replied, "I understand my rights." Davis asked William if he wanted to waive his rights, and William replied that he was willing to talk to them. Davis asked William if he could read and write. Williams said he could and said that he had completed the 10th or 11th grade. Davis asked William if he had any further questions about his rights and William replied in the negative.

After this, the detectives told William that a child's body had been found in the river. Questioning continued. At 7:20 p.m., the officers gave William a fresh pack of cigarettes. William suddenly asked if the officers knew anything about his tennis shoes, which he said had been stolen earlier at the river. At about 8 p.m., the officers provided food to William. William told the officers that if things did not get cleared up in the future, he would need an attorney. Davis asked if William wanted a lawyer immediately. William said no.

During this interview, William continued to talk about various unrelated topics. The detectives continued to press William and told him that they did not believe his version of the events. At about 9:55 p.m., Davis accused William of being homosexual. William then, in obvious reference to Richard, stated, "You are trying to say I raped and mutilized [sic] him."

William gave his version of the laundry arrangement again and then told officers he had left his shirt by the bridge. Later, Officer Malson took Davis' place in the interview room. At 2:28 a.m., Davis had obtained a search warrant for a sexual assault kit. He entered the room and, without telling William where he was taking him, said, "Get up, let's go." Malson told William it was his last opportunity to tell the truth. William told a story about "a colored guy" who had killed Richard and cut his head off.

William then told a different story. He said that Richard had gone swimming in the river and drowned. He said he cut off Richard's hands, feet, and head in order to bury him more easily. When asked where Richard's clothing was, William replied that Richard "was born naked and died naked."

Davis and Malson left to take William to Lawrence Memorial Hospital at 4:08 a.m., in order to execute the search warrants. While waiting at the hospital, William told Officer Harmon that he could not believe "that he had accomplished the things he had accomplished with Richard Settlemyre." He then said he really had wanted to bury Richard and that he "had a hard time with the neck, but the rest came off like ice cream."

At the hospital, the warrant was executed. William's clothes and personal items were confiscated; hair samples, blood samples, fingernail scrapings, anal swabs, and saliva samples were taken.

After the search, William was taken to the media room to smoke a cigarette. William again told Harmon that Richard had drowned. Harmon told William that an autopsy would reveal whether Richard had drowned. William said, "Okay, I killed him."

William then stated that he had gone "berserk," or he "just went berserk like a force" and had stabbed Richard. He said he had cut Richard's throat twice and may have stabbed him several more times. He stated that he had the desire to have sex with Richard, that he had been fighting "the temptation" for two years, and that something had possessed him.

William then stated that he was "wondering what an attorney could do for him now." Harmon asked William if he wanted an attorney and William said he did. Harmon ordered all questioning to cease. At 5:35 a.m., William was formally placed under arrest for the murder of Richard Settlemyre. When told of his arrest, William said, "I knew I was."

On the morning of July 15, 1988, while in Douglas County Jail, William began pounding on the walls and yelling that he needed to talk to someone. Albert Deathe, an employee at the sheriff's department, told William that he would come back when he had time. Later on the 15th, and again, on the 16th (at William's request), Deathe talked to William. Deathe testified that he did not question William except to clarify something that

William told him. He said that William was very upset and wanted to talk all the time.

William told Deathe that he did not understand why he had "done it" to Richard and that he usually picked on small animals and fish. William told Deathe that he had buried the hands and feet separately because he could not dig a hole big enough for the body. He said that he had used a knife to slit Richard's throat and had thrown the knife in the river. He said he knew that Richard did not suffer because he had cut his throat.

An acquaintance of William's, Phil Rutledge, visited William in jail. William told him, "I don't know why I did it." He told Rutledge that whenever he felt that he might hurt the Settlemyre boys, he always instructed them to leave, but this time he did not tell Richard to leave.

Prior to trial, the defense moved to have all of William's statements to officers suppressed. The trial court found that William was not in custody until 6:50 p.m., when Richard's body was located; that William understood his rights; that the police acts did not deprive William of his ability to make voluntary and intelligent choices; and that the statements to Deathe were voluntarily made. The trial court admitted the confessions.

On August 12, 1988, a competency hearing was held. The court admitted a report by Dr. Fowler, a psychologist at Bert Nash Community Mental Health Center. Fowler had given William a battery of standardized tests and interviewed him. He concluded that William was not competent to stand trial. Fowler stated that William did understand the nature of the charges against him, but that he could not assist his attorneys with his defense. He said, specifically, that there were periods in which William's contact with reality became defective, that he was suffering from massive anxiety, and that he had a borderline I.Q. The trial court found William incompetent to stand trial and sent him to Larned State Hospital for treatment and evaluation.

On November 23, 1988, a second competency hearing was held. One defense witness was Kathleen Gottlieb, a speech pathologist. She testified that William had severe difficulty communicating, that his speech was distorted, and that he omitted subjects, verbs, and conjunctions. She testified that William was egocentric and was unable to understand abstract information.

She testified that he had the language skills of a nine- or ten-year-old. She testified that he had the decisionmaking ability of a fourth grader.

William's attorney personally told the court that, in his opinion, William could not assist with his defense.

The court also considered three reports on William's condition. One of these was a team report by the Larned State Hospital, which stated that William was competent to stand trial. The Larned report concludes that William was suffering from "Adjustment Disorder with Anxious Mood; Borderline Intellectual Functioning; Antisocial Personality Disorder; Paranoid Personality Disorder; and Alcohol Abuse, Mild." The report found that William's main problem interfering with assisting in his defense was anxiety, that he had improved greatly with his stay at Larned, and that he should continue taking a mild anti-anxiety drug on his return. The report concluded that William was competent to stand trial.

The trial court found William competent to stand trial. However, on March 9, 1989, he was again found incompetent to stand trial and was again committed to Larned.

Another competency hearing was held on October 31, 1989. The team report from Larned concluded that William was competent to stand trial. The members of the team testified. Dr. Charles Befort, a psychologist at Larned, testified that, although William did have serious emotional problems, he was able to reason and draw conclusions. He testified that William had a Schizotypal Personality Disorder, which included paranoid ideas and odd beliefs, including his beliefs that someone else committed the murder. He said, however, that based on William's ability to reason—e.g., that he understood that he could be convicted if he insisted on his story as to what happened—that William was competent. He testified that William's biggest problem was anxiety and his emotional reactions to situations.

Robert Huerter, another psychologist from the Larned hospital, testified, generally, to the same points as Befort. He added that William had a "borderline I.Q." of 71 to 84. Huerter also testified that William told him, "I had to play the nut role or they would have sent me to prison."

Dr. J.L.L. Fernando, a psychiatrist at Larned, testified that William was competent, but that his competence was tenuous. He testified that William tended to talk off the subject but did not appear to be suffering from hallucinations or delusions.

Dr. Anthony Troiano, another psychiatrist at Larned, testified that William was competent and was not schizophrenic or delusional, although William did believe that a cult in Lawrence was responsible for all deaths in Lawrence since 1987. By "not delusional," Troiano testified he meant that William had no structured delusional system and that William's bizarre beliefs were the result of being immature and self-protective.

The defense called Dr. Herbert C. Modlin, a psychiatrist at the Menninger Clinic. He testified that William was in pretty good contact with reality and could communicate until he discussed the crime, in which case he became delusional. He testified that in earlier examinations he had found William not to be competent, but that he had improved considerably since spring. He testified that William now was marginally competent to stand trial and that he could communicate rationally with his attorneys until he got to his version of the crime.

The defense also called Robert Schulman, a clinical psychologist. He testified that William was a paranoid schizophrenic with a structured delusional system. He testified that an I.Q. of 72 is considered mildly retarded, that William's I.Q. was 72, that William had a poor memory, that he could not conceptualize or abstract, and that he was not competent, mainly because of his delusional system.

The trial court concluded that William was competent to stand trial. The court admitted that William's competency might be borderline, but said that his main problems were with communication and his choice of an inappropriate defense.

The case proceeded to trial on November 7, 1989. William refused to leave his cell unless he was allowed to do so without being handcuffed. An undersheriff stated he was reluctant to have William in court without restraints in place. The defense moved for another competency evaluation. The trial court decided to talk to William in his cell. The trial court concluded that William was competent and that he tended to drift off topic, but that he could be brought back on the subject.

The case proceeded to trial and the defendant was convicted of first-degree murder. Other facts will be developed as the issues are discussed.

### 1. Felony-Murder Issue

The jury was instructed that it could rely on the alternate theories of premeditated murder and felony murder in arriving at its verdict on first-degree murder. Following PIK recommendations, the jury was not required to indicate which theory it relied on. The possibility exists that some jurors relied on felony murder. William contends that the evidence was insufficient to prove the underlying felony in the felony-murder charge of attempted aggravated criminal sodomy.

William argues that the only evidence of a sexual assault on Richard was William's confession that he attempted to have sex with Richard after Richard was dead. His argument is twofold. He contends that the first-degree murder statute, K.S.A. 21-3401, requires that the State prove the death occurred while defendant was perpetrating or attempting to perpetrate a felony. In addition, he contends that attempting to commit sodomy on a dead body cannot be the underlying felony in felony murder because the crime of aggravated criminal sodomy cannot be accomplished on a dead body.

Defendant places great weight on *State v. Garcia*, 243 Kan. 662, 669, 763 P.2d 585 (1988), in which this court held that if, in a prosecution for felony murder, two underlying felonies were relied on and the evidence was insufficient to convict on one of the two, the murder conviction could not stand. The State argues this case was not sent to the jury on two underlying felonies and that when both premeditated murder and felony murder are charged, the jury can convict on either theory, *i.e.*, premeditated murder or felony murder *or* a combination of the two, citing *State v. Wise*, 237 Kan. 117, 697 P.2d 1295 (1985), and *State v. McCowan*, 226 Kan. 752, 759, 602 P.2d 1363 (1979).

The error, if any, in this type of case is usually whether the trial court allows a criminal charge to be submitted to the jury that should have been dismissed. Here, defendant moved for a judgment of acquittal. The issue is not whether there is sufficient evidence for the entire jury to convict on felony murder, but whether one or more reasonable jurors could have relied on felony

murder because, when alternate theories of first-degree murder are charged, jurors can rely on either theory.

Here, the trial court refused to grant defendant's motion for acquittal and submitted the issue of felony murder to the jury. The trial court's duty has been before this court many times. For example, in *State v. Fosnight*, 235 Kan. 52, Syl. ¶ 1, 679 P.2d 174 (1984), we said:

"A trial judge, in passing on a motion for judgment of acquittal, must determine whether upon the evidence—giving full play to the right of the jury to determine credibility, weigh the evidence and draw justifiable inferences of fact theref rom—a reasonable mind or a rational trier of facts might fairly conclude guilt beyond a reasonable doubt."

The same test applies as our scope of review for this issue. In a criminal case, we review all the evidence, viewed in a light most favorable to the prosecution and, if the evidence there convinces us that a rational factfinder could have found the accused guilty beyond a reasonable doubt, we affirm. *Jackson v. Virginia*, 443 U.S. 307, 61 L. Ed. 2d 560, 99 S. Ct. 2781, *reh. denied* 444 U.S. 890 (1979); *State v. Graham*, 247 Kan. 388, 799 P.2d 1003 (1990).

K.S.A. 21-3501(2) defines sodomy as "oral or anal copulation . . . or any penetration of the anal opening by any body part or object. Any penetration, however slight, is sufficient to constitute sodomy." Criminal sodomy is defined as "sodomy between persons of the same sex or between a person and an animal." K.S.A. 21-3505(1). Aggravated criminal sodomy is "sodomy with a child who is not married to the offender and who is under 16 years of age." K.S.A. 21-3506(a). William correctly argues that criminal sodomy (or aggravated criminal sodomy) may not be committed on a dead body. The underlying felony was, however, *attempted* aggravated criminal sodomy. An attempt at a crime is "any overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-3301(a).

Defendant's basic arguments (other than that his statements are not admissible, which will be discussed later) is that no overt act occurred while Richard was alive and that it is impossible to commit attempted aggravated sodomy on a dead body.

The attempt (overt act) must occur before the accused knows the victim is dead. It is the intent of the accused to attempt to commit the crime that is at issue and, if the accused did not know the victim was dead, the defense of impossibility would not prohibit a conviction of attempted aggravated criminal sodomy.

The defense of impossibility, K.S.A. 21-3301(b), provides: "It shall not be a defense to a charge of attempt that the circumstances under which the act was performed or the means employed or the act itself were such that the commission of the crime was not possible."

In *State v. Logan & Cromwell*, 232 Kan. 646, 656 P.2d 777 (1983), this court held that K.S.A. 21-3301(b) eliminates both factual impossibility and legal impossibility as defenses to an attempted crime. The court gave as examples of factual or legal impossibilities concerning attempted murder:

"A fires shots into a bed believing his enemy B is asleep thereon. If B were in fact dead rather than asleep on the bed when the shots were fired, the doctrine of legal impossibility would be applicable. If however, B heard A coming and was hiding in the closet when the shots were fired, then a case of factual impossibility is presented." 232 Kan. at 647.

*Logan & Cromwell* would only apply, however, when the accused did not know the person was dead. One element of an attempt is intent to commit the crime. If the accused knows the person is dead, and it is legally impossible to commit the crime against the dead person, then there could be no intent. Consequently, here, if William knew that Richard was dead, and the only evidence points to an attempt after the death, then the defense has a valid point.

The continuous transaction theory also is an issue that affects whether aggravated sodomy may be attempted on a dead body. The defendant relies on *People v. Sellers*, 203 Cal. App. 3d 1042, 250 Cal. Rptr. 345 (1988). In *Sellers*, the defendant had been convicted of felony murder, with the underlying felony being rape. The evidence showed that sexual penetration took place after the victim was dead. The Court of Appeals held that felony murder could not be based on such facts, even by use of a "continuous transaction" theory because it would amount to turn-

ing intercourse with a dead body into rape. 203 Cal. App. 3d at 1053-54.

*Sellers* is not on point. It does not concern an attempt. In two prior California cases, however, courts held that felony murder could be based on attempted rape when actual penetration took place after the victim was dead. See *People v. Quicke*, 61 Cal. 2d 155, 158, 37 Cal. Rptr. 617, 390 P.2d 393 (1964); *People v. Booker*, 69 Cal. App. 3d 654, 666, 138 Cal. Rptr. 347 (1977). The *Sellers* court quoted with approval from *Booker*: " 'When a conviction of first degree murder is based on the theory of killing during an *attempted rape*, it is irrelevant whether the victim was already dead at the time of penetration.' (Italics added.)" *Sellers*, 203 Cal. App. 3d at 1053 (quoting *Booker*, 69 Cal. App. 3d at 666). See *People v. Goodridge*, 70 Cal. 2d 824, 76 Cal. Rptr. 421, 452 P.2d 637 (1969).

Felony murder may be based on attempted aggravated sodomy (or attempted rape) whenever the murder is connected with the attempt. However, application of the felony-murder rule is questionable when the attempt at sexual contact occurs after the victim is already dead.

A conviction can be based on circumstantial evidence, and intent as an element of a crime may be shown by acts, circumstances, and inferences reasonably deductible therefrom. *State v. Keeler*, 238 Kan. 356, 359, 710 P.2d 1279 (1985).

The evidence is as follows:

One law enforcement officer asked William what had led up to the killing. The officer testified he asked William "if it had been his desire to have sex with Richard, and he replied that he really didn't want to talk about it, but he had thought about it" and that he had been fighting the desire to have sexual contact with Richard for a long time. William referred to this desire as "the temptation."

The officer went on to testify:

"Q. Did you have any further discussion about the killing of Richard Settlemyre?
"A. Yes, I did.
"Q. And would you describe for us what the discussion was after that?
"A. Well, *I had asked him what had led up to the killing of Richard, and we went into more detail as far as explaining his sexual urges.*

"Q. Is there anything you recall specifically about that conversation?
"A. I recall him telling me that he had not had sex with a woman since he had been on the road, and he clarified that by telling me it had been quite a period of time, and he told me that Richard was the closest thing that he could find to a woman." (Emphasis supplied.)

William told Detective Davis, prior to his interrogators' learning the condition of Richard's remains, "You are trying to say I raped and mutilized [sic] him." Richard's clothing was found over 90 feet from where his body was found. William stated that Richard was "born naked and he died naked."

Although the record concerning the attempted sexual assault is such that William only expressly admitted to a physical sexual assault after Richard's death, the jury was not bound by that representation, considering the other evidence present.

The jeans shorts of Richard and the jeans worn by William had only a few spots of blood on them, which gives some indication they were not being worn at the moment Richard's throat was cut. It was established that William was wearing a green T-shirt when he left with Richard. Green cloth was found at the murder scene that appeared to be T-shirt material. The cloth contained Richard's blood, hair similar to that of Richard, and a piece of human bone. No evidence was offered that the green cloth was, in fact, a T-shirt or that it was the T-shirt William was wearing. William gave the officers four different versions of what happened to the T-shirt, ranging from his having given it to an unidentified woman who laundered his clothes to a story that he set the shirt on fire and placed the burning shirt on a raft and allowed it to drift down the river. The State argues that a reasonable person could conclude that neither Richard nor William were wearing their pants when Richard was killed and that William was wearing a green T-shirt that was found at the crime scene as green rags. This evidence has some probative value.

William also had a history of bondage with the Settlemyre boys. Fishing cord (described as trout line cord) was found among William's possessions after the crime that matched three pieces of cord found at the crime scene in lengths that a reasonable person could conclude were used to bind Richard's hands and feet. One of the pieces of cord found at the crime scene had human blood on it. The State's pathologist testified he found no

evidence that Richard had been tied up when he was killed and, if Richard had been, he should have found marks on his person. A reasonable jury could conclude that the cord was removed before Richard was killed or that no marks were found because Richard's hands and feet (as well as his head, both breasts, penis, and scrotum) were severed from his body and that the severing process eliminated any bondage marks.

Richard was taken to a remote area where the trees and brush were thick enough that light could not penetrate to the ground. A reasonable jury could conclude William did this in order to have sex with Richard unobserved.

This court has held that mere arrival at the scene where the crime is to be committed is sufficient to constitute an overt act. See *State v. Chism*, 243 Kan. 484, 490, 759 P.2d 105 (1988). We have further said that "No definite rule as to what constitutes an overt act for the purposes of attempt can or should be laid down. Each case must depend largely on its particular facts and the inferences which the jury may reasonably draw therefrom." *State v. Garner*, 237 Kan. 227, Syl. ¶ 3, 699 P.2d 468 (1985).

We are satisfied that all the evidence before the jury, when viewed in a light most favorable to the State, is such that a reasonable person could weigh the evidence and draw reasonable inferences therefrom and conclude, beyond a reasonable doubt, that William killed Richard as a result of an attempt to commit aggravated criminal sodomy.

Thus, the trial court did not err in submitting the issue to the jury on both felony-murder and premeditated murder theories.

2. Statement Prior to *Miranda* Warnings

This particular argument covers statements made by the defendant prior to receiving his *Miranda* rights. The defense argues that William was "in custody" or significantly deprived of his freedom during the time in question. The trial court concluded that William was not in custody until after Richard's body was found and William was *Mirandized*. The trial court held:

"The missing person investigation involving defendant started at approximately 10:20 a.m. on July 14, 1988, and ended at approximately 6:50 p.m. on the same day when Richard's body was found in the Kansas River . . . Until Richard's body was found, the police were without knowledge that a crime had been committed and the investigation was not criminal

in nature. Prior to the discovery of Richard's body, nothing was said or done by the police, either in their manner of approach or in the tone or extent of their questioning, which would have indicated that they would not have [heeded a request by] defendant to leave. The defendant was not in custody and [the] *Miranda* warning was not necessary."

In *State v. Fritschen*, 247 Kan. 592, 600-03, 802 P.2d 558 (1990), this court determined that the proper analysis of whether a person is "in custody" is an objective analysis that ignores subjective beliefs, personality, and mental capacity of the defendant. The proper analysis is how a reasonable person in the suspect's position would have understood the situation. Then, if a reasonable person would have felt that he was "in custody," any statements given before the suspect was advised of his or her *Miranda* rights must be excluded.

William was first contacted by law enforcement officers at approximately 10:30 a.m. and spent the remainder of the day with the police. At no point during the day, until they read him his *Miranda* rights, did the police make any act or statement to William which would have led a reasonable person to believe he was not free to leave. The police asked William's help in locating a missing boy that William had been fishing with two evenings prior. There was no evidence the boy was dead or the victim of foul play, although foul play was suspected. The questions asked by the police were, for the most part, questions that attempted to elicit information about where the boy might have gone. For instance, the police asked William to show him where the boy frequently fished and swam. The police asked William to show the route Richard supposedly used to walk home. None of this would have made a reasonable person believe William was in custody, although the police did become obviously more suspicious as the day wore on.

It is also relevant that at no point did the police tell William that he was in custody or that he was not free to leave, nor was William handcuffed or physically restrained. At one point the police let William go into a convenience store unescorted. The mere fact that William was questioned at the police station is not determinative either. This is a natural place for the law enforcement officers to stop to gather more information and review what has happened.

During the afternoon, law enforcement personnel did learn about John William's mental history as well as his having been the subject of a murder investigation in Texas prior to his 18th birthday. In that case, a 12-year-old boy had been murdered. But, the fact that William may have become the "focus" of the investigation is not determinative under the reasonable person standard.

Our scope of review is not to retry issues of fact. We examine the record to ascertain whether the evidence, when examined in a light most favorable to the party who prevailed in the trial court, supports the trial court's findings of fact. Here, the trial court ruled that William was not in custody until after the body was found, and the record contains substantial competent evidence to support that conclusion.

### 3. Voluntariness of Confession
#### a. *M'Naghten* Test

The defendant contends that his various confessions and incriminating statements were not voluntary and that the standard used by the State in this case is erroneous.

A confession must be voluntary to be admissible. A person's mental capacity is relevant in determining whether a confession was voluntary. *Culombe v. Connecticut*, 367 U.S. 568, 602-03, 6 L. Ed. 2d 1037, 81 S. Ct. 1860 (1961). In determining whether a confession is voluntary, a court is to look at the totality of circumstances. *Fikes v. Alabama*, 352 U.S. 191, 197, 1 L. Ed. 2d 246, 77 S. Ct. 282, *reh. denied* 352 U.S. 1019 (1957). This court follows that standard. See *State v. Waugh*, 238 Kan. 537, 541, 712 P.2d 1243 (1986).

The defendant argues that this court has adopted a different test in cases where a question arises concerning an accused's mental disability at the time a confession is made.

The defendant relies on language in *State v. Pursley*, 238 Kan. 253, 258, 710 P.2d 1231 (1985), and *State v. Boan*, 235 Kan. 800, 804, 686 P.2d 160 (1984).

In *State v. Boan*, this court said:

"The question as to the effect of mental illness on the voluntariness of a confession has been before this court on several occasions. In *State v. Pyle*, 216 Kan. 423, 440, 532 P.2d 1309 (1975), it was held that the test for determining whether a suspect has the mental capacity to make a voluntary

confession is the same as the test for determining his criminal responsibility for committing the crime. In absence of insanity meeting the *M'Naghten* test, the mental condition of a defendant at the time he makes a statement is relevant to the issue of voluntariness but is not necessarily conclusive; its weight is for the trier of fact. A trial court's finding, after a *Jackson v. Denno* hearing, that the defendant was sane and made his confessions knowingly and voluntarily is binding on appellate review if supported by substantial competent evidence." 235 Kan. at 804.

The defense argues that this violates due process because there is a difference between whether a person's mental state affects the voluntariness of a confession and insanity. The argument is that *State v. Boan* places the burden of proof on the defendant to prove that his confession was involuntary.

The *M'Naghten* test is a test of whether a person is responsible for his criminal acts. "The accused is to be held not criminally responsible (1) where he does not know the nature and quality of his act, or in the alternative, (2) where he does not know right from wrong with respect to that act." *Boan*, 235 Kan. at 809.

As the *Boan* court noted, mental conditions lesser than the *M'Naghten* rule are relevant on the issue of voluntariness.

*Boan* seems to imply that if a person is "insane," as a matter of law, his statement should be excluded. In *Colorado v. Connelly*, 479 U.S. 157, 93 L. Ed. 2d 473, 107 S. Ct. 515 (1986), the defendant walked up to a police officer on the street and started confessing to a year-old murder. The police officer *Mirandized* the defendant and asked questions to determine if the defendant had been drinking. The defendant kept confessing. The defendant subsequently revealed that it was God who told him to come to Denver and confess, and it became obvious defendant was mentally ill. 479 U.S. at 160-62.

In *Connelly*, the Colorado Supreme Court held that the test for admissibility is whether the statements are " 'the product of a rational intellect and a free will' " and that " 'the absence of police coercion or duress does not foreclose a finding of involuntariness.' " 479 U.S. at 162 (quoting *People v. Connelly*, 702 P.2d 722, 728 [Colo. 1985]). It held the accused's confession was not the product of a rational intellect and a free will because of his severe mental illness.

The United States Supreme Court reversed, holding that the mental condition of a defendant is a significant factor in deter-

mining whether a confession is voluntary, but that a "defendant's mental condition, by itself and apart from its relation to official coercion, should [n]ever dispose of the inquiry into constitutional 'voluntariness.' " 479 U.S. at 164. Simply put, the Supreme Court held that the totality of the circumstances is to be used to determine voluntariness of a confession and that mental illness is only one factor to be considered in that determination. It also held there must be a link between coercive activity of the State and the confession. The Court went on to say that the defendant did not contend the law enforcement officers' actions were coercive and, thus, there was no federal constitutional issue under the Due Process Clause of the Fourteenth Amendment, and the question whether the confession was unreliable was a matter to be governed by the evidentiary laws of the State of Colorado.

K.S.A. 22-3215(4) provides that the burden of proving that a confession or admission is admissible shall be on the prosecution. The prosecution must prove the confession or admission is admissible by a preponderance of the evidence. *Connelly*, 479 U.S. at 168; *State v. Miles*, 233 Kan. 286, 295, 662 P.2d 1227 (1983).

What Kansas has done is given the defendant, under evidentiary laws of the State of Kansas, more protection than the Constitution of the United States requires; that is to say, if a defendant meets the *M'Naghten* test at the crucial time, the confession is not voluntary. If not, the mental illness is one factor to consider in determining the totality of the circumstances. Thus, the burden is not shifted to the defendant. The State still has the burden, pursuant to K.S.A. 22-3215(4), to prove the confession is admissible. The State does not, however, have a burden to prove the defendant does not meet the *M'Naghten* test.

The trial court said that, while William gave some inappropriate answers to questions, he appeared basically rational and not under the influence of alcohol or drugs and noted that William clearly understood his rights, as shown by his request for a lawyer. The trial court concluded:

"Defendant had advised the police that he has a 10th or 11th grade education and can read and write. The evidence indicated defendant had some mental deficiencies, but did not indicate defendant was insane. As a whole, the evidence indicated that defendant's intellect was such that he understood his rights and could make rational, voluntary statements."

The trial court clearly placed the burden of proof on the State and considered the evidence as a whole.

The trial court used the correct burden of proof in determining the voluntariness of the confession.

### b. Totality of Circumstances

The defendant next argues that, even if the trial court placed the burden properly, its conclusions were erroneous. The trial court said:

"The defendant, throughout the investigation, before and after it became criminal in nature, was with the police approximately 19 hours of which approximately 6 hours had been interrogation. Defendant had not been isolated or in solitary confinement, but had been traveling in a police car, and sitting in an office at the police station and at the hospital. He made no requests to communicate with anyone until he asked to see a lawyer. He did not request that he be allowed to sleep. He was given frequent breaks, food, drink, and cigarettes. The officers' interrogation was fair and not coercive. Defendant was not, either by police acts or by his own intellect, deprived of his free choice to admit, deny, or refuse to answer questions and statements, and defendant's confessions were freely, voluntarily and intelligently made."

In *State v. Price*, 247 Kan. 100, Syl. ¶ 1, 795 P.2d 57 (1990), this court set out some factors a court may consider to help it determine whether, under the totality of the circumstances, a confession was voluntary. The list includes the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation.

In *State v. Norris*, 244 Kan. 326, 768 P.2d 296 (1989), this court set forth the standard of review for a trial court's determination that a confession was voluntary:

" 'When a trial court conducts a full pretrial hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely, voluntarily and knowingly given and admits the statement into evidence at the trial, the appellate court should accept that determination if it is supported by substantial competent evidence. [Citations omitted.]' " 244 Kan. at 333 (quoting *State v. Brown*, 235 Kan. 688, 691, 681 P.2d 1071 [1984]).

William argues that police interrogated him nonstop for nineteen hours, denied him rest, and in effect, coerced his confession.

The facts, when viewed as we must view them on appellate review, show that during the day when William was not in custody, most of the day was spent actually driving around looking for Richard. Several times during the day William was allowed to get, or was provided with, food. The actual interviews at the police station were not lengthy. There is no indication of a good cop/bad cop routine nor any threats. During the day William never asked to leave.

In *People v. House*, 141 Ill. 2d 323, 566 N.E.2d 259 (1990), a murder suspect was held by police for some 37 hours in a sparsely furnished room (no bed) and questioned repeatedly. He was fed regularly and given access to a restroom. He gave a statement after 25 hours, which linked him to the murder, and, after 37 hours, he confessed. The Illinois Supreme Court held the statement voluntary.

In the case before us, the questioning was not continuous. This period included several breaks and a trip to the hospital to execute the search warrant (which had to be executed then for fear of losing the evidence). Further, this period of time is also partially justified because officers were still gathering other physical evidence and trying to sort out what they had.

Also, during this time period, the questions asked were fair. No one ever promised William he could go to sleep as soon as he confessed. The officers honored William's rights when he asserted them. When William first suggested that he might need a lawyer if things were not cleared up, the officers immediately offered him the opportunity to contact one. William did not want one. During this time period, William had the opportunity to communicate with the outside world.

William had had a long day. However, he never requested sleep. The length of the day does not appear to be an attempt by the officers to coerce William; rather, it was the result of the need to find Richard and then to obtain and execute a search warrant on William before the evidence was lost.

The defense argues that William's mental condition, in combination with the lengthy questioning, made his statements involuntary. The evidence, however, does not show that William was unusually susceptible to questioning or authority. The State showed that William was responsive to questioning all day.

Defendant's brief refers to William as mentally retarded. The testimony was that he was borderline mentally retarded. Some of the tests placed William in the low range of average intelligence. Defendant's arguments are largely an effort to get us to reweigh the evidence. That is not our function.

The defense argues that the officers' friendliness influenced William. This is not persuasive. Law enforcement officers should be encouraged to treat the public with courtesy and friendliness—not discouraged from doing so by our holding a confession involuntary because of friendly, courteous treatment.

Although there is evidence to the contrary (*i.e.*, William's presence among law enforcement officers for a long period of time and his mental deficiencies), there is substantial competent evidence to support the trial court's finding that William's confessions were voluntary.

### 4. Validity of *Miranda* Waiver

As to whether the coercion by officers and William's mental condition made William's waiver of his *Miranda* rights involuntary, the above discussion concerning coercion of confessions applies. There was simply no coercion. The conversation between William and the officers at this point was brief. One officer asked William whether he understood his rights and about his educational background. There is substantial competent evidence to support the trial court's finding that the waiver was voluntary.

The trial court also found that the waiver was knowing. The trial court largely based this finding on the fact that William understood his rights, that he mentioned getting an attorney at one point, and that he finally did request one.

Here, defendant also argues that he could not understand the *Miranda* warnings and the waiver was not a free and deliberate choice. The trial court found William understood his *Miranda* rights and that is demonstrated by the record when William talked about possibly needing an attorney in the future and then requesting one. We are satisfied the trial court did not err in holding William's waiver of his *Miranda* rights was valid.

### 5. Statements Made After Request For Counsel

John William invoked his right to counsel in the early morning hours of July 15, 1988. At that time, Officer Harmon ordered that all questioning cease. Formal charges were filed, and William

made his first appearance in court a few hours later. During that court appearance, counsel was appointed for William. That afternoon, William pounded on the walls of his cell and, when Albert Deathe responded, William said he needed to talk to someone. Deathe replied he would return when he finished his afternoon chores, and he returned between 6:00 and 6:30 p.m. Deathe testified that he primarily listened, but did ask questions if he did not understand William. Deathe testified William was upset and hard to understand at times. William talked about his relationship with his mother, his childhood, and his relationship with people he had lived with. Deathe testified the only talking he did was to ask William to repeat things he (Deathe) did not understand or to ask William to explain what he meant by certain statements.

A second conversation took place the following day. Then, Deathe's supervisor learned of the conversations and ordered them to cease. Deathe's testimony at both the trial and at the suppression hearing is general in nature. No one inquired as to any specific questions Deathe asked, what statements were clarified, or what statements Deathe had not understood and had asked William to repeat.

At trial, Deathe's testimony covers only eleven pages. He testified William told him Richard did not suffer because William had cut his throat; that William did not understand why he had done it and did not understand why he did not do it to himself instead of Richard. William also told Deathe he threw the knife he used to cut Richard's throat into the river. William first told Deathe he had blacked out and, when he came to, he found the body. The following day he said he remembered getting in a fight with two men. The second day he "mentioned that when he had killed the boy, that he had seen his mother's face somehow laughing at him."

Defendant argues that he was denied his Sixth Amendment right to assistance of counsel (applied to the states through the Fourteenth Amendment) when the incriminatory statements were made. In essence, defendant' s argument is that he was entitled to have counsel present during the two episodes that occurred at the jail.

The right to counsel attaches at the initiation of judicial proceedings. *Brewer v. Williams*, 430 U.S. 387, 398, 51 L. Ed. 2d 424, 97 S. Ct. 1232, *reh. denied* 431 U.S. 925 (1977). In Kansas, this right is held to attach at the filing of a complaint or information against the defendant. *State v. Waugh*, 238 Kan. 537, 545, 712 P.2d 1243 (1986). Obviously, William's Fifth Amendment rights to counsel had attached because he was in custody.

Here, the record reflects that a complaint was filed on July 15, 1988, and William made his first court appearance. Following our rule, William's Sixth Amendment rights had attached.

Further, William did assert his right to an attorney when he was being formally arrested.

The rule on interrogations absent counsel is that "once adversary proceedings have commenced against an individual, he has a right to legal representation when the government interrogates him." *Brewer*, 430 U.S. at 401. This right is violated if the State subsequently elicits admissions from the accused in the absence of counsel. *Massiah v. United States*, 377 U.S. 201, 12 L. Ed. 2d 246, 84 S. Ct. 1199 (1964). In *Michigan v. Jackson*, 475 U.S. 625, 636, 89 L. Ed. 2d 631, 106 S. Ct. 1404 (1986), the United States Supreme Court said, "if police initiate interrogation after a defendant's assertion, at an arraignment or similar proceeding, of his right to counsel, any waiver of the defendant's right to counsel for that police-initiated interrogation is invalid."

Here, however, William initiated the contact with Deathe. In fact, William insisted on talking to Deathe. It was William who insisted on talking about the crime. Deathe played a passive role. Although Deathe asked clarifying questions, the evidence shows that Deathe was not attempting to elicit information. The defendant makes no argument that the State initiated the conversation. No effort was made to show what specific questions Deathe asked or what answers were elicited. The record does not reveal when the questions were asked or whether they encouraged the defendant to confess as opposed to discussing his relationship with his mother and his childhood memories. In short, there is no evidence to demonstrate error in the trial court's conclusion that the statements were voluntarily made.

The United States Supreme Court has not specifically considered whether an accused may initiate contact with police after

an assertion of his Sixth Amendment Rights. The Court, however, has held that such statements do not violate an accused's Fifth Amendment right to counsel. Recently, in *Minnick v. Mississippi,* 498 U.S. ___, 112 L. Ed. 2d 489, 111 S. Ct. 486 (1990), the Court reaffirmed the rule that once an accused asserts his Fifth Amendment right to counsel, police may not reinitiate interrogation. The Court said, however: "*Edwards* does not foreclose finding a waiver of Fifth Amendment protection after counsel has been requested, provided the accused has initiated the conversation or discussions with the authorities; but that is not the case before us." 498 U.S. at ___, 112 L. Ed. 2d at 499. See *Edwards v. Arizona,* 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, *reh. denied* 452 U.S. 973 (1981).

In *Michigan v. Harvey,* 494 U.S. ___, ___, 108 L. Ed. 2d 293, 302, 110 S. Ct. 1176 (1990), the United States Supreme Court said that *Edwards* is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." Deathe did not badger William.

In *State v. Hollis,* 240 Kan. 521, 528-29, 731 P.2d 260 (1987), this court held that when a defendant initiates contact with police to discuss the crime after an assertion of her Sixth Amendment rights, the defendant waives the right to counsel and the statements she makes are admissible. See *State v. Hartfield,* 245 Kan. 431, 781 P.2d 1050 (1989).

Because William initiated the contact and Deathe did not attempt to elicit confessional statements, the defendant waived the right to counsel and no error is shown.

Even if we held the confession inadmissible, it would be no comfort to the defendant, for, under the facts of this case, it would be harmless error beyond a reasonable doubt. To be harmless error, the State must prove beyond a reasonable doubt that the error did not contribute to the verdict. See *Pope v. Illinois,* 481 U.S. 497, 501-04, 95 L. Ed. 2d 439, 107 S. Ct. 1918 (1987). Harmlessness must be determined on the basis of remaining evidence. *Coy v. Iowa,* 487 U.S. 1012, 1022, 101 L. Ed. 2d 857, 108 S. Ct. 2798 (1988). In *Milton v. Wainwright,* 407 U.S. 371, 33 L. Ed. 2d 1, 92 S. Ct. 2174 (1972), it was held the admission of a confession was harmless error beyond a reasonable doubt in view of three other earlier confessions.

Here, there was ample evidence before the jury—William's prior confessions and the physical and scientific evidence—to prove William was guilty of killing Richard so that the confessions made to Albert Deathe would not, beyond a reasonable doubt, have contributed to the verdict in this case.

### 6. Competency To Stand Trial

On appeal, the reviewing court's inquiry on this issue is limited to whether the trial court's finding of competency amounted to an abuse of discretion. *State v. Soles*, 224 Kan. 698, 700, 585 P.2d 1032 (1978). William contends that the trial court abused its discretion in finding him competent to stand trial.

K.S.A. 22-3301 provides:

"(1) For the purpose of this article, a person is 'incompetent to stand trial,' when he is charged with a crime and, because of mental illness or defect is unable:
"(a) To understand the nature and purpose of the proceedings against him; or
"(b) to make or assist in making his defense."

Also, the test is stated in the often-quoted case of *State v. Severns*, 184 Kan. 213, 219, 336 P.2d 447 (1959):

"[T]he test of insanity of an accused precluding his being *put on trial* for a criminal offense is his capacity to comprehend his position, understand the nature and object of the proceedings against him and to conduct his defense in a rational manner. Stated in different fashion, if the accused is capable of understanding the nature and object of the proceedings going on against him; if he rightly comprehends his own condition with reference to such proceedings, and can conduct his defense in a rational manner, he is, for the purpose of being tried, to be deemed sane, although on some other subject his mind may be deranged or unsound."

See *Dusky v. United States*, 362 U.S. 402, 4 L. Ed. 2d 824, 80 S. Ct. 788 (1960).

In this case, the question was whether William was able to make or assist in making his defense. Early in the proceedings, William was unable to do so. However, the fact that he was incompetent at one point does not mean he could not improve and become competent. At the competency hearing immediately prior to trial on October 31, 1989, the team from Larned said William was able to assist in his defense. Dr. Modlin, called by the defense, said he was borderline able to; Robert Schulman said he was not.

In examining the testimony of all of the medical experts, several generalizations can be made. As the trial judge noted from his own interview with William—and the experts generally testified to this—William had the ability to communicate and make rational decisions. Admittedly, he had problems doing so, but with effort he could be kept on track. William's ability to communicate and reason suffered when he was under stress, but this had been controlled somewhat during his treatment at Larned. If this was the only problem, then it would be quite easy to say that the trial court did not abuse its discretion, for the trial court decides disputed testimony.

This is a closer question, however. William insisted that a cult in Lawrence had committed the murder. Earlier, William was obviously aware that he killed Richard—he confessed and drew maps of where he buried the head, feet, and hands. The medical experts, however, all thought that William later formed a belief that he did not commit the crime. Can a criminal defendant be competent to stand trial when he believes others committed the crime?

The trial court apparently did not believe that William actually thought a cult committed the murder, or, at least, the trial court did not think this was a problem. The court said:

"It is generally agreed by both medical and lay witnesses that Defendant's counsel will have difficulty communicating with and counseling in areas of his defense, however, that alone does not equate to incompetency. The defendant has apparently chosen a defense that counsel do not consider to be in his best interest, however, the defense of his choice was not made without his knowledge of the consequences."

If William really believed a cult killed Richard, this presents a question that is analogous to the issue of whether a defendant with amnesia is competent to stand trial.

In *State v. Blake*, 209 Kan. 196, 495 P.2d 905 (1972), the defendant argued that he had amnesia and could not remember any of the events leading to the murder for which he was charged. This court specifically considered approaches to this issue that are taken by other jurisdictions and decided on the following rule:

"The presence of amnesia does not *per se* render a defendant incompetent to stand trial. It is a factor to be considered in determining whether he is

able to give rational assistance to his counsel, present any reasonably available defenses, and obtain a fair trial." 209 Kan. 196, Syl. ¶ 2.

See *State v. Owens,* 248 Kan. 273, 807 P.2d 101 (1991).

Here, William had confessed repeatedly and did not have many possible defenses. There was testimony at the hearing that William understood that if he insisted on his version of the events he would probably be convicted and sent to prison. Ultimately, William chose the insanity defense. The fact that William may not have believed he had committed the crimes certainly is not incompatible or prejudicial to his ability to assert this defense, and no prejudice resulted.

The trial court was extremely conscientious in this case and devoted an inordinate amount of time and effort to insure that William was given a fair, complete, and impartial hearing on the issues. The evidence was conflicting concerning the defendant's competency to stand trial, and we cannot say the trial court abused its discretion in holding the defendant was competent to stand trial.

### 7. Sanity When Crime Occurred.
William relied on the defense of insanity at trial.

In Kansas, the test for insanity is the *M'Naghten* test, under which the accused is held to be not criminally responsible for his acts (1) where he does not know the nature and quality of his act, or in the alternative, (2) where he does not know right from wrong with respect to the act. *State v. Boan,* 235 Kan. 800, 809, 686 P.2d 160 (1984).

The standard of appellate review for sufficiency of the evidence is well established:

"When the sufficiency of evidence is challenged, the standard of review on appeal is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, the appellate court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt." *State v. Graham,* 247 Kan. 388, Syl. ¶ 5, 799 P.2d 1003 (1990).

The State presented evidence from a number of non-law enforcement people who observed and talked to William both before and after Richard was killed, and their testimony, standing alone, would form a basis for a jury to determine that the defendant did not meet the *M'Naghten* test for insanity. In addition, William

cut off and buried the identifiable body parts (an act Dr. Modlin thought was significant because it suggests William knew what he was doing at the time he killed Richard).

William also left a notebook at the scene that attempts to set up an alibi. In the notebook, William first described a rape, death, and mutilation of a young woman (similar somewhat to Richard's death and mutilation) by three men who put the body and body parts in the river. This supposedly took place between William's campsite and North Lawrence.

In the notebook, William then described what he did on the day Richard was killed and the following day. Highly summarized, he described getting and taking Richard fishing and walking Richard part-way home. He then expresses a wish to take Richard and his brother, Butch, fishing the following day.

The entry the following day (the day following Richard's death) contains a message to Richard and Butch that, if they come by to go fishing, to stay at the campsite until he returns. He tells them there is drinking water, but to save him some. The notebook then purports to show William returned and then left for lunch, and contains a note to that effect and that Richard and Butch could hang around the campsite if they want to. The notebook also contains other writings of the defendant that clearly show a person having mental problems.

Because William later admitted to killing Richard, a jury could easily find that the notebook was a conscious attempt to establish an alibi and show lack of knowledge concerning Richard's death. It was not until later that William became convinced that a cult had killed Richard. By attempting to establish an alibi, William showed he was not insane at the time of the crime.

Further evidence of this is that Dr. Modlin was of the opinion that William had not formed that delusion until after he killed Richard. Dr. Modlin testified he had examined the police interrogations on July 14, 15, and 16 and concluded:

"THE WITNESS: His language was adequate. His responses were relevant and coherent. He understood the questions, and his answers, you know, went along with the questions. He gave two or three versions of what happened or what might have happened, and one of them was that he committed the crime, and he was visibly upset and cried more than once, which I would consider a very understandable, normal reaction to someone

in this situation, recalling what had happened. Another time or two, he was quite composed. One striking episode was that he was able ·to describe dismembering the body. He had difficulty getting the head off, but the hands and feet came off like ice cream.

"Q. (By Mr. Flory) Doctor, if this crime was committed in the course of a delusion, a true delusion, would a person be able to set forth all the details like he did, attributing them to himself?

"A. In a way, that would be possible, but no evidence of delusion material showed up. That is, he had no explanation at first. He offered no explanation. 'It was a terrible thing, you know. I must have gone berserk. I must have blacked out.' He didn't have any explanation of it then at all. One little thing came up on the — I believe it was on the 16th. It appeared in Mr. Deathe's report — that Mr. William mentioned that he thinks he saw his mother's face and it is kind of a vague response. Did he see his mother's face in Richard? It wasn't quite clear, and then he immediately sort of followed that up by, 'Therefore, my mother is responsible for this.' And that may be the very first — that is the first inkling, the first beginning that I am aware of that he began developing an explanation, which now is well developed.

"Q. And that was several days after the crime had occurred?

"A. Right.

"Q. Would the fact that the defendant removed the identifiable parts of the body, that being the hands with the fingerprints, and the feet with the footprints, and the head with obvious identifying characteristics, would that fact be significant to you in determining whether or not at the time of the crime, immediately thereafter, the defendant understood the nature of his acts?

"A. It certainly suggests that he knew what he was doing at the time. It's consistent with a remark he made to Mr. Rutledge, I believe, that he was considering turning himself into the police, so he knew, at least at that time, that he had done something wrong.

"Q. Would the comment about considering turning himself in, would you consider that a significant fact?

"A. Yes. It means he has some contact with how society operates. You know, he knows there is a police force and knows there are laws. He know he broke a law and the police would be interested.

"Q. Would the fact that there was an effort made to secret or hide or dispose of evidence be significant in determining the defendant's mental state at the time of the crime?

"A. Yes, it suggests that he was in sufficient contact with reality and able to make the judgment that he should conceal the crime. Pretty obvious. That is just common sense."

William was able to function normally after the murder; he spent a good part of one day showing officers various routes and

fishing holes and had no problem communicating with the law enforcement people.

The jury also heard William's statements to law enforcement personnel concerning Richard's death. They observed the map William drew of the murder scene showing where the murder took place and where the various body parts were buried, as well as a drawing showing the way "he" (Richard) looked at 3:04 a.m. (showing a body with arms and legs but no head, hands, or feet).

Dr. Modlin, a highly respected psychiatrist, testified that William, at the time of Richard's death, did "not meet the requirements for insanity." Dr. Modlin was referring to the *M'Naghten* test.

The evidence in this case is such that a reasonable person could conclude, beyond a reasonable doubt, that William knew the nature and quality of his act, and that he knew right from wrong with respect to the act.

### 8. Cross-Appeal

The State, as cross-appellant, argues that the trial court erred in excluding a note that was in William's possession when he was arrested. In the note, obviously directed to Richard, William wrote: "Now I got you tie up." Then William threatens to cut off Richard's private parts if he does not engage in "gay sexs," which he specifically describes in the note.

The problem concerning admissibility is due to the fact that the note was taken from William's personal possessions at the Law Enforcement Center a day after William's arrest. The personal property had been removed from William's possession and placed in a manila envelope and put in a property locker when William was booked into jail.

The evidence and court rulings concerning the note developed in this manner.

At the preliminary hearing, Detective Davis testified he had William empty his pockets into a paper sack when the search warrant was executed at the hospital. Davis noticed a wallet and papers. He did not examine the sack contents and testified the standard procedure was to inventory the personal property when the accused is booked into jail. He was not present when William was booked into jail and did not see the personal property inventoried.

Officer Mike Riner testified he was assigned to inventory the defendant's personal property the day following the formal charges being preferred against William. He found the note wadded up in an egg-shaped ball in the middle of three business-sized envelopes that were folded in thirds and folded around the note.

The trial court, based on the evidence before it at that time, held that the note was admissible under the "second look" doctrine, which will be discussed later.

A motion to suppress was filed. A law enforcement officer with the Douglas County Sheriff's Office testified that she observed William empty his pockets at the hospital under police supervision. She recalled seeing a wallet and some business-type envelopes and a wadded-up piece of paper. She noticed William was concerned about the wadded-up paper and said, "He dropped it on the floor several times, picked it up, always placed it back in between on the inside of the business-type envelopes. He didn't place it in one of them. He placed it between them and kept it covered." The following day she recalled the incident and told the officer in charge of the investigation about it. Officer Riner was immediately dispatched to review the contents of the defendant's property.

Another officer, Randy Roberts, a corrections officer with the Douglas County Sheriff's Department, testified that, in the process of booking in the defendant, he looked in the sack of personal possessions. He said he just flipped through the papers to see if there was any money that needed to be separated and then listed them on the inventory sheet as miscellaneous papers. There were some envelopes relating to food stamps so all he noted on the inventory sheet was food stamps. He did not individually read any of the sheets of paper. He stuck all of the papers in a property envelope.

The trial court was of the opinion that there was never a "first look" of the note in question, and absent a "first look" (which identifies the items so the police ultimately know they are useful as evidence in the case) there can be no "second look." The trial court was also justifiably critical of the law enforcement personnel's handling of the inventory.

It is not necessary in this opinion to trace the history of the development of search and seizure under the Fourth Amendment.

What we are dealing with here is a post-arrest detention issue that simply boils down to the question of whether the law enforcement officers can go through the personal possessions of the accused that were being held for safekeeping and seize evidence without a warrant under circumstances in which the officers could have and should have examined the items seized when the defendant was first booked into jail.

A kindred issue was first considered by the United States Supreme Court in *United States v. Edwards*, 415 U.S. 800, 39 L. Ed. 2d 771, 94 S. Ct. 1234 (1974). In that case, Edwards was placed in jail and the following morning his clothing was taken from him and held as evidence. The Sixth Circuit Court of Appeals held that, after the administrative process and the mechanics of booking the defendant was completed, the arrest had come to a halt and law enforcement officers could not take the clothing from the defendant without obtaining a warrant. 415 U.S. at 802.

The Supreme Court noted:

"With or without probable cause, the authorities were entitled at that point [at the booking process] not only to search Edwards' clothing but also to take it from him and keep it in official custody. There was testimony that this was the standard practice in this city. The police were also entitled to take from Edwards any evidence of the crime in his immediate possession, including his clothing." 415 U.S. at 804-05.

The Supreme Court said, "Indeed, it is difficult to perceive what is unreasonable about the police's examining and holding as evidence those personal effects of the accused that they already have in their lawful custody as the result of a lawful arrest." 415 U.S. at 806. It pointed out that the test is not whether it is reasonable to procure a search warrant, but whether the search itself was reasonable.

The Court said:

"[*United States v. Caruso*, 358 F.2d 184 (2d Cir.), *cert. denied* 385 U.S. 862 (1966),] is typical of most cases in the courts of appeals that have long since concluded that once the accused is lawfully arrested and is in custody, the effects in his possession at the place of detention that were subject to search at the time and place of his arrest may lawfully be searched and seized without a warrant even though a substantial period of time has elapsed between the arrest and subsequent administrative processing, on the one hand, and the taking of the property for use as evidence, on the other. This is true where the clothing or effects are immediately seized upon arrival

at the jail, held under the defendant's name in the 'property room' of the jail, and at a later time searched and taken for use at the subsequent criminal trial. The result is the same where the property is not physically taken from the defendant until sometime after his incarceration." 415 U.S. at 807-08.

In *Baskerville v. United States*, 227 F.2d 454 (10th Cir. 1955), Baskerville was arrested and booked into jail and his personal property was placed in an envelope. The envelope had been stored with the property custodian of the Denver jail. Some two weeks later, a United States secret service agent went to the jail and examined the defendant's personal effects in the envelope and discovered an identification card that had evidentiary value. The Tenth Circuit held that the search was incident to a lawful arrest, even though the search took place two weeks later.

In *People v. Rivard*, 59 Mich. App. 530, 230 N.W.2d 66 (1975), the police noticed a blue sapphire ring when they booked defendant at the police station and inventoried his property. The ring was later seized for evidence from the property locker. The Michigan Court of Appeals held that the defendant had no reasonable expectation of privacy concerning the ring on the basis that no warrant would have been required to seize the ring during the inventory. 59 Mich. App. at 533-34.

We have had one occasion to consider this issue. In *State v. Costello*, 231 Kan. 337, 644 P.2d 447 (1982), the defendant was booked and his personal property placed in an envelope for safekeeping at the Wyandotte County Jail. A large ring with a distinctive square face was removed from his finger and placed in the personal property envelope. Defendant argued that the State could not later take the ring from the envelope for use as evidence at trial without a search warrant because it would violate the Fourth Amendment. We cited *United States v. Jenkins*, 496 F.2d 57 (2d Cir. 1974), where law enforcement officers took a "second look" and seized money belonging to the defendant without a warrant. The money had been removed from the defendant's possession when he was incarcerated. Later, the police learned that some of the money taken in the crime defendant was suspected of committing had had the serial numbers recorded. They went back into the defendant's possessions and checked the serial numbers of the money there and discovered a match. The court considered the same argument that is at issue in this case and

said, "This argument ignores the fact that once the money had been lawfully taken by the police for safekeeping [defendant] no longer could reasonably expect any right of privacy with respect to the serial numbers." 496 F.2d at 73 (citing *United States v. Edwards*, 415 U.S. at 807).

This court in *Costello* went on to hold:

"On the basis of the holdings in the foregoing cases, we hold when an accused has been lawfully arrested and is being held in custody, the personal effects in his possession at the time and place of his arrest may lawfully be searched, inventoried, and placed in safekeeping by the police without a search warrant when the search and seizure is incidental to the arrest. Thereafter, although a substantial period of time may have elapsed since the administrative processing, a 'second look' at the inventoried personal effects may be obtained without a search warrant, and any property which is relevant for use as evidence in the accused's trial may be removed from the place of safekeeping." 231 Kan. at 342.

William would limit our holding in *Costello* to those cases where the law enforcement officers have observed the item and recognize it to be evidence at a later date. We do not believe that to be the law. Our broad holding in *Costello* is consistent with what a majority of the courts are holding. 2 LaFave, Search and Seizure § 5.3(b), pp. 494-96 (2d ed. 1987) states:

"But, should it be so that the police may search through an incarcerated defendant's personal effects any time during the period of his pretrial incarceration merely on the basis that they are doing nothing more than could have been done at the time of arrest or booking? If the test is what could have been done at these earlier occasions, then (to pass on to the second question set out earlier) it would seem that the police are relieved not only of the obligation of securing a warrant but also of the obligation of establishing probable cause to search through the property previously inventoried and those items of personalty retained by the incarcerated defendant, for probable cause that particular items of evidence are to be found is not required at the time of the custodial arrest (per *Robinson*) or at the time of booking (per *Edwards*). That is, the police could conduct a search upon the mere hunch that something of evidentiary value with respect to the charged offense or, indeed, any other offense might be found. A majority of the courts which have considered the question seem to assume that the police may do precisely this. 'The underpinning of these cases is that the items in question have been exposed to police view under unobjectionable circumstances, so that no reasonable expectation of privacy is breached by an officer's taking a second look at matter with respect to which [the] expectation of privacy already has been at least partially dissipated.'

"It does not appear that this issue has been settled by the *Edwards* decision. True, at one point the Court speaks of the authority of the police to search 'without probable cause,' which sometimes has been interpreted as resolving the matter, but this statement appears in the context of a discussion of 'when Edwards was placed in his cell' and what the authorities were entitled to do 'at that point in time.' It is never expressly stated that the continuing authority to search is of this same dimension, although admittedly some of the Court's language might be read as suggesting such a conclusion. However, other language in *Edwards* expresses caution on this point, particularly that in footnote 9:

" 'Holding the Warrant Clause inapplicable in the circumstances present here does not leave law enforcement officials subject to no restraints. This type of police conduct "must [still] be tested by the Fourth Amendment's general proscription against unreasonable searches and seizures." [citing *Terry v. Ohio*] But the Court of Appeals here conceded that probable cause existed for the search and seizure of respondent's clothing, and respondent complains only that a warrant should have been secured.'

"The question is a difficult one, for rational arguments can be made upon both sides of the issue. There is certainly something to the contention that a 'second look' at what was lawfully seen at the time of inventory does not invade any substantial privacy interest. Yet, by hypothesis the second look must be an intrusion somewhat greater than the first, for otherwise the probable cause would exist in advance of the taking of the second look. It may be that the argument for requiring probable cause is greater when the purpose of the search is to find evidence relating to a crime other than that for which the person is in custody. Permitting a more careful post-booking search to find evidence of the crime for which the arrest was made more clearly relates to what might well have been done at the time of booking had all the facts and circumstances of the case then been assembled and evaluated."

Here, a law enforcement officer, during the process of removing the personal possessions from the accused, observed the note in question and the fact that the accused appeared to be possessive and concerned about the paper and was attempting to place it so that it would not be observed. Because the investigators had earlier found defendant's notebook, which was an important piece of evidence, the officers would have had reason to look at the crumpled-up piece of paper.

We are convinced that the plain view doctrine is not the ultimate test. If it were, the majority in *Edwards* would have held that the clothing remained in plain view at all times and the case would have been decided on that point. Nor does the problem of probable cause seem persuasive. In most of the cases, officers

did not have probable cause for a search during the "first look." The probable cause came later. We are satisfied that the test is simply whether the items were lawfully seized in the first instance. Once they are lawfully seized and retained for safekeeping, the accused has no expectation of privacy and the officers may thereafter, in our opinion, take a "second look" at the inventoried personal effects without a search warrant and remove any evidence from the place of safekeeping. The trial court erred in suppressing the note.

The defendant's conviction is affirmed. The State's cross-appeal is sustained.