No. 69,599

STATE OF KANSAS, *Appellee*, v. KENNETH WADDELL, *Appellant*.
(874 P.2d 651)

Opinion filed May 27, 1994.

*Jean K. Gilles Phillips*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, was with her on the brief for appellant.

*Joan M. Hamilton*, district attorney, argued the cause, and *Robert T. Stephan*, attorney general, was with her on the brief for appellee.

The opinion of the court was delivered by

SIX, J.: This is a sufficiency of the evidence case grounded on a claim that the defendant's confession was uncorroborated. Kenneth Waddell was convicted by a jury of aggravated sexual battery, K.S.A. 21-3518, and felony murder, K.S.A. 1992 Supp. 21-3401(a)(1). Our jurisdiction is under K.S.A. 1993 Supp. 22-3601(b)(1) (direct appeal if the conviction is a class A felony or if a maximum sentence of life imprisonment is imposed).

The questions for review arise from Waddell's dual claims that: (1) the evidence was not sufficient to support his convictions of felony murder and aggravated sexual battery; and (2) the trial court erred in instructing the jury on the burden of proof necessary to convict.

Our standard of review on sufficiency of the evidence is whether, after review of all the evidence, viewed in the light most favorable to the prosecution, we are convinced that a rational factfinder could have found Waddell guilty beyond a reasonable doubt. *State v. Bradford*, 254 Kan. 133, Syl. ¶ 3, 864 P.2d 680 (1993). Waddell did not object to the burden of proof instruction.

The clearly erroneous standard of review applies. K.S.A. 22-3414(3). We find no error and affirm.

Facts

Waddell, who was 25 years old at the time of the murder, has a history of mental health problems. He has been institutionalized since he was 6 years old. He was transferred from Larned State Hospital to Topeka State Hospital (TSH) in April 1987. Stephanie Uhlrig worked as an activity therapist at TSH. On Sunday, February 23, 1992, Stephanie and another therapist, Robin Figgs, took a group of TSH patients, including Waddell, to a matinee movie. Waddell, who collected coins, had left some of them with Stephanie for safekeeping prior to the movie outing. She may have stored the coins in her office in the Slagle Building at TSH.

The group returned at approximately 4:30 p.m. The only two patients who remained at the Slagle Building were Arlie Miller and Waddell. The Slagle Building was locked with a deadbolt that must be manually opened with a key. It is possible to exit the building through crash doors without a key. Stephanie let Arlie in to use the restroom and waited for her by the door. Arlie went out the door and Stephanie started to lock it when Waddell asked for his coin collection. Stephanie unlocked the door, and Waddell followed her inside. Arlie returned to her ward. Arlie stated that she did not see anyone else with Waddell or Stephanie and did not observe anyone around the building. Waddell testified that he went with Stephanie to get the coins when Arlie went in to use the bathroom.

Figgs and another TSH staff member were in the Slagle Building. Both received phone calls from Stephanie's husband around 6:00 p.m. He was looking for his wife. Figgs believed Stephanie was still on the premises because he had seen her car and her coat. Figgs was unable to locate her.

At 6:00 that evening, the Slagle Building opened for activities. Waddell was the first patient to arrive. About 10 minutes later, Waddell and other patients told Figgs that they needed to use the restroom but that someone was in the stall. Figgs observed a pair of tennis shoes under the restroom stall door, just as though

the person were using the toilet. He opened the door, which was not latched, and found Stephanie. She was seated on the toilet, leaning towards the right with her head up in the corner at an unnatural angle. Figgs could not find a pulse. Her mouth was full of blood, and she had markings on her face and neck. Stephanie was naked from the waist up, and her jeans were unzipped. A dark blue sweater, a bra, and a set of keys were discovered in the corner of the stall.

Dr. Maureen E. McCabe, a physician, attempted to revive Stephanie. Among other things, Dr. McCabe observed that there were small hemorrhages around Stephanie's eyes and around the orbits of her eyeballs. Dr. McCabe also observed discoloration on Stephanie's face, particularly about her cheekbones and the side of her face and on her neck. When Dr. McCabe repositioned the body to perform CPR, she noticed a crackling feeling in Stephanie's neck, which she recognized from prior experience was often a sign of a hyoid fracture. Dr. McCabe was informed that two patients had seen and reported the body. She testified that when she spoke with Waddell,

"[h]e was quite distraught; he was sitting in a waiting area on a bench. He was leaning forward with his—his arms on his knees, his hand buried—his face buried in his hands, and he was crying. He was talking to himself, sometimes talking to other people about him."

She further explained that

"[h]e said that—how sorry he was, that Stephanie was a beautiful woman, that she had never hurt anybody, he didn't understand how this could have happened; asked why it had happened, who could have done such a thing, and then talked again about how helpful she had been to him and to other patients during their stay at the hospital, recounted their—in fact having just gone out to a movie that evening."

The coroner determined that manual strangulation was the cause of death. He testified that it would take approximately four to five minutes for someone Stephanie's size to die from a lack of oxygen. The coroner observed bruise marks on the back of Stephanie's neck that appeared to have been caused by fingers. He also noticed a small bruise on her right ear and a bruising area on her back. He testified that a sweater could have been

used around Stephanie's neck but that it was not the primary cause of the strangulation. He further testified that the hyoid bone was broken and that tightening a sweater around the neck could not cause such a fracture. He also failed to find any evidence that Stephanie had suffered multiple blows to the head. The coroner noted an abrasion or scraping over the inner portion of the left collarbone. He observed two abrasions or scrapes of the skin of the left breast which he believed might have been caused by something such as the metal catch on her bra when it was removed.

Officer O'Neill secured the crime scene and began collecting names of people in the immediate area. O'Neill testified that Waddell appeared to be very upset and was crying. He asked Waddell what he knew. Waddell replied that he had gone into the men's restroom and saw feet under the toilet stall. According to O'Neill, Waddell did not say when he determined that something was wrong, but he did state that he called his friend. Detective Young testified that Officer Carter was assigned to interview two patients, Paul Dwyer and Clarence Davis. Young reviewed Carter's reports, which indicated both Dwyer and Davis stated they were in the Slagle Building men's restroom after 6:00 p.m. Carter did not testify. The interviews of Dwyer and Davis did not reveal anything of significance to the detectives.

The crime scene was examined for physical evidence. Among other things, the blue sweater, a bra with a hook forcibly removed, a bra hook, a set of car keys, and a small drop of blood on the floor were gathered. An omni alternate light source that will illuminate blood and other body fluids was used to view the area. The only fluids discovered were urine samples on the walls behind the urinals. Hairs were gathered from the floor.

A forensic examiner from the Kansas Bureau of Investigation examined three hairs collected from Stephanie's abdominal area. The examiner concluded that one was a pubic hair and one was a head hair, both similar to samples taken from Stephanie, and that one was a Negroid pubic hair (Waddell is white). No direct evidence was found that would place Waddell in the restroom.

None of the pubic hairs gathered in a rape kit examination were foreign to Stephanie. A body hair and some fibers in the fingernail scrapings also were discovered. The hair was not Waddell's. The examiner believed the white cotton fibers could have been taken from a white t-shirt worn by Waddell. She emphasized, however, that the fiber evidence was of limited value because white cotton is commonly worn.

An edited videotape of an interview with Waddell was admitted into evidence to show Waddell's demeanor. On the tape, Waddell denied having any involvement in the crime. The jury was admonished that the tape was not offered for the truth of the matter.

Waddell phoned Don Krueger, an Emporia attorney, four days after the homicide and asked him to come to Topeka. Krueger, who was representing Waddell on other matters, complied with the request. According to Krueger, the two were discussing unrelated matters when Waddell stated that he was worried about what crime the police could charge him with for the homicide and the possible penalties. Krueger detailed all the charges and penalties he believed were conceivable. He began with the hard-40 sentence and worked downward to the lesser included offenses. Krueger described Waddell's demeanor at the time as "very agitated". The following exchange occurred at trial between Krueger and the prosecutor:

"Q. And what occurred at the end of that unrelated discussion?

"A. As I was getting ready to leave, I told him I would see him in several weeks or a week or whatever, and he then—I opened the door and, as I opened the door to the room where Mr. Waddell and I were sitting, he said, 'Don, stop. I want to tell you how I killed her.'

"Q. And did he do so?

"A. Well, then, you know, it was a complete surprise to me so I went and sat back down with him and listened to him.

"Q. And what was it that he told you?

"A. He told me that he was in the rest room and at the sink and the victim came up behind him and touched his shoulder and he turned around and hit her with an open fist in the head and then, after that, where she had fallen down apparently unconscious, he removed her sweater or long-sleeved shirt and fondled her breasts and wrapped the shirt or sweater around her neck.

"Q. And did he tell you what he did after that?

"A. That was it. I said, 'Well, you don't have to tell anybody this.' He said, 'Well, I want to talk to the police.' And I said, 'They are getting ready to feed you; if you are going to talk to the police, I want to be present.' So, I called my office, I believe, from my car phone, got the telephone number of the Detective who had called me, and called him and said, 'Mr. Waddell wants to discuss a matter with you.' And from there I went to lunch; apparently he had lunch.

"I came back. I again went into the room with him by myself, advised him that he had a constitutional right not to speak to anyone, and he said, 'I still want to speak to the police.' And, therefore, I said I would be present when he did."

Krueger was present when the police interviewed Waddell. He again advised Waddell of the constitutional right not to discuss anything. Krueger testified that he did not advise Waddell to confess to a crime that he knew his client had not committed and that he never would give such advice to anyone. Krueger had spoken with Detective Young prior to the time he met with Waddell. Krueger testified that he could not remember the contents of his conversation with the detective. Detective Young testified that he discussed the case with Krueger, providing him with a general overview.

Waddell confessed to the crime during his February 27, 1992, statement to the police. The confession was tape-recorded and played for the jury at trial. Waddell said he went into the men's restroom and stayed, knowing that if he waited long enough Stephanie would come and check on him. Stephanie came in and asked if he needed help. She reached out to touch him, and he struck her on the left side of her head near the temple. He explained that she fell to the floor, and he proceeded to punch her in the head and face another five to seven times while she was on the floor. Waddell stated that he then removed her sweater and unhooked her bra from the front and removed it as well. He fondled Stephanie's breasts, propped her up on the toilet, and shut the stall door. He said he threw her sweater and bra on the floor of the stall.

Detective Young asked Waddell what had caused the marks on Stephanie's neck and left breast. Waddell replied that he did not

know. The detective asked Waddell if he used the sweater or his hands to strangle Stephanie. The question was followed by a long pause. Waddell finally stated that he used the sleeve of her sweater. Waddell ultimately told the police that he strangled Stephanie before he fondled her and that he had wrapped the sweater around her neck for approximately 40 seconds to a minute. Waddell said that he remembered there were tears in her eyes. He left the building through the crash doors.

Later, Waddell stated that Charles Simmons, a patient and his best friend, had nothing to do with the murder. According to Waddell, the police were incorrectly accusing Simmons of masterminding the murder. Another detective present at the interview asked Waddell about Stephanie's unbuttoned pants. Waddell responded that he did not unbutton or unzip her pants. The detective inquired why Waddell had not "made love" to Stephanie as long as her pants were unbuttoned. Waddell asked for the interview to end. Detective Young then placed Waddell under arrest for Stephanie's murder.

At trial, Waddell testified that Krueger told him the police had a solid case against him, the only way out was to admit to the crime, and if he did not do so he would get the hard 40. Waddell claimed that, as a result, he agreed to confess. At trial, he testified that he did not kill Stephanie. He stated that the story he had told the police was a lie. Waddell admitted that he had sent a letter to Simmons. The letter stated, in part:

"I've talked to my lawyer the other day he said that the police has no evidence that I kill Stef all they can prove is that I was in that bathroom at one time or another and of course they are going to prove that because I was one of two people who found her, that confession, it's not going to hold up to a hill of beans because it not accurate."

Waddell concluded his testimony by asserting that he had confessed to a crime he did not commit to save himself from the hard 40.

Mark Evan Coffman, a friend, went to see Waddell in the Shawnee County jail. Coffman testified that when he asked about the crime, Waddell

"first said that he—he had committed the crime; later on had specified that he didn't. And then close to the end of visitation he said that he—that he had but they couldn't prove anything.

. . . .

"[H]e stated that he was—something along the lines that he was sick in the rest room, bent over in the rest room and that's basically all he speculated on. Then he went on to tell me that his attorney told him not to speculate on anything else at that time."

Coffman also indicated that he had not spoken with the police, district attorney, or anyone connected with the case prior to the time he visited Waddell.

An aide at TSH testified that he knew Waddell well. The aide was coming out of the dining room around 5:25 p.m. the day Stephanie died and walked past Waddell. Waddell did not speak to him. At the time, the aide thought Waddell was acting strangely, like he was troubled or something was bothering him.

A TSH patient record with a notation written by Stephanie was admitted into evidence. The notation stated:

"[Patient] attended seven of eight leisure arts and crafts groups, all but one on his own initiative. He continues to participate with enthusiasm and concentration, enjoying a variety of projects. He has shown no hostile behavior in the group but does become demanding at times in his monopolizing of this therapist's attention, seemingly oblivious of others' needs or his inappropriateness. When told he needs to wrap up his story as others need attending to, he does so but begrudgingly as if the request is unreasonable. . . . Positively reinforce cooperative, appropriate socializations and confront demanding, hostile behavior. Stephanie Uhlrig, ATT."

### Waddell's Confession

Waddell contends that the only evidence presented by the State that supported a finding that he was guilty was his uncorroborated confession. He recognizes that the United States Supreme Court has said that corroboration of an extrajudicial confession is necessary, but it is sufficient "if the corroboration merely fortifies the truth of the confession, without independently establishing the crime charged." *Smith v. United States*, 348 U.S. 147, 156, 99 L. Ed. 192, 75 S. Ct. 194 (1954). Waddell asserts that his confession is totally uncorroborated and that there are many discrepancies between his statement and the facts concerning the cause of Ste-

phanie's death. Consequently, he maintains that there was insufficient evidence to convict him of either crime. He discusses his recorded confession and suggests that the sum total of his own uncoaxed confession was that he beat up Stephanie and then fondled her. Waddell explains that he never stated that he strangled Stephanie and, in fact, he actually denied choking her. According to Waddell, the portion of his confession where he states that he strangled Stephanie is the result of "very leading questions and a great deal of coaxing on the part of the detectives."

Waddell concludes that his confession does not match the facts surrounding Stephanie's death. He emphasizes that she showed no sign of being beaten about the head and face several times. He notes that Stephanie was not strangled with a sweater and that her bra, which fastened in the back (Waddell had stated that he unhooked the bra in the front), had been forcibly removed. The keys he said he had set on top of the sweater were discovered underneath it.

Waddell asserts that there is a real possibility that he is lying about the role he played in Stephanie's death. He suggests that there was a motivation for him to lie: His best friend (Simmons) was being accused of murder. According to Waddell, the combination of his upbringing and schizophrenia created the potential for him to lie to save his friend. Waddell claims that other possible witnesses or suspects, patients Dwyer and Davis, were not pursued.

The State highlights the following in support of its claim that even without Waddell's confession, a rational factfinder could find that he was the killer: (1) Waddell was the last person to be with Stephanie; (2) no other patients or staff members were with her at the estimated time of death; (3) Waddell was the first person to come to the crime scene and to report the body; (4) his behavior was suspicious immediately following the time when Stephanie was killed; (5) he confessed to a friend of many years; and (6) he told his attorney that he wanted to tell him how he killed Stephanie. Consequently, the State believes the corroboration rule has been met. We agree. A conviction will be upheld if tangible corpus delicti evidence is proved outside that of the con-

fession. See *Smith*, 348 U.S. at 153-54. *United States v. Wilson*, 529 F.2d 913, 915 (10th Cir. 1976), reasoned that a defendant's confession alone may establish the fact that he or she committed the crime; independent corroborating proof of identity is not required.

The details of Waddell's confession are supported by the evidence: (1) A bra hook was discovered, and the bra had been forcibly removed; (2) Waddell's white t-shirt contained fabric consistent with the fiber under Stephanie's fingernails; (3) a set of keys was barely observable and a bra was found under the sweater that could not be seen until the sweater was removed; and (4) bruising on Stephanie's head was consistent with her having been hit. The weight and credibility of a confession is for the jury to determine. Free, voluntary, and deliberate confessions are entitled to great weight. *Wilson v. United States*, 162 U.S. 613, 621-22, 40 L. Ed. 1090, 16 S. Ct. 895 (1896).

Waddell relies on *Wong Sun v. United States*, 371 U.S. 471, 488-89, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963), to support his claim that his alleged uncorroborated confession was inadequate to support his conviction. In *Wong Sun*, the Court noted: "It is true that in *Smith v. United States* . . . we held that although 'corroboration is necessary for all elements of the offense established by admissions alone,' extrinsic proof was sufficient which 'merely fortifies the truth of the confession, without independently establishing the crime charged . . . .' 348 U.S., at 156." 371 U.S. at 489. In a footnote, the Court provided further explanation:

"Where the crime involves physical damage to person or property, the prosecution must generally show that the injury for which the accused confesses responsibility did in fact occur, and that some person was criminally culpable. A notable example is the principle that an admission of homicide must be corroborated by tangible evidence of the death of the supposed victim. See 7 Wigmore, Evidence (3d ed. 1940), § 2072, n.5. There need in such a case be no link, outside the confession, between the injury and the accused who admits having inflicted it." 371 U.S. at 489 n.15.

In *State v. Bradford*, 254 Kan. 133, 864 P.2d 680 (1993), we considered whether the State had failed to prove the corpus delicti of a felony murder. In affirming the conviction, we also re-

viewed whether Bradford's uncorroborated confession was sufficient to place him at the crime scene or prove whether he committed the underlying felony. We relied on *Gribble v. State*, 808 S.W. 2d 65, 70 (Tex. Crim. 1990), *cert. denied* 111 S. Ct. 2856 (1991), explaining that

" '[s]uch evidence need not, however, be sufficient by itself to prove the offense of kidnapping. [Citations omitted.]. . . [T]he quantum of independent evidence necessary to corroborate the corpus delicti in a criminal prosecution relying upon the extrajudicial confession of a accused need not be great. [Citation omitted.] So long as there is some evidence which renders the corpus delicti more probable than it would be without the evidence, we believe that the essential purposes of the rule have been served. [Citations omitted.] 808 S.W.2d at 71-72." 254 Kan. at 139.

The State, in the case at bar, only needed to establish the corpus delicti with evidence independent of Waddell's confession. This burden is satisfied by the evidence, which supports the jury's verdict.

## The Aggravated Sexual Battery Charge

Waddell contends that the aggravated sexual battery of Stephanie occurred after she was dead; consequently, he cannot be guilty of felony murder because there is no felony to support the conviction.

Waddell suggests that his confession is the only evidence presented to the jury concerning the cause of Stephanie's death. He maintains that in his confession he stated that he strangled her prior to the fondling of her breasts. He recognizes that the pathologist testified that in order for a person to die from strangulation, continuous pressure must be applied for four or five minutes and that if the pressure is loosened prior to death, the body will resume breathing on its own.

We recently addressed the issue of whether a defendant can be found guilty of committing sex offenses on a dead body. See *State v. William*, 248 Kan. 389, 400, 807 P.2d 1292, *cert. denied* 116 L. Ed. 2d 89 (1991) (criminal sodomy cannot be committed on a dead body); and *State v. Perkins*, 248 Kan. 760, 771, 811 P.2d 1142 (1991) ("Because of the close analogy between aggravated criminal sodomy and rape, the same rule applies: Rape can

only be committed against a living person.") Waddell insists that because it was a legal impossibility for him to commit the crime of aggravated sexual battery by fondling a dead body, it was erroneous for the jury to convict him of that crime.

Waddell admits that in his confession he stated that he removed Stephanie's bra before he strangled her. He suggests that such conduct does not rise to the level of a completed aggravated sexual battery and that, at the most, this act demonstrates an intent to commit an aggravated sexual battery. Waddell explains that K.S.A. 21-3518(d) provides that an aggravated sexual battery is a sexual battery of a person who is unconscious or physically powerless. He emphasizes that sexual battery requires the actual touching of another. K.S.A. 21-3517. Waddell contends that the removing of clothing does not constitute actual touching. Rather, it is the act in preparation for the actual touching, the fondling of the breasts. He asserts that the completion of the act took place after Stephanie was dead.

The State explains that *William* was discussed during Waddell's trial. The trial judge gave several instructions to prevent potential problems regarding Stephanie's status at the time of the aggravated sexual battery. The State explains that the defense counsel raised the *William* issue during the instructions conference but failed to object to the instructions as they were presented to the jury. The State concludes that there was sufficient evidence to show Stephanie was unconscious at the time of the aggravated sexual battery and the conviction should be affirmed. We agree.

Waddell stated in his confession that he fondled Stephanie before and after he strangled her. Don Krueger testified that Waddell said he fondled, then strangled, Stephanie. The jury is presumed to have followed its instructions and to have accepted the State's version of the events. See *State v. Cromwell*, 253 Kan. 495, 510, 856 P.2d 1299 (1993). The evidence, when viewed in the light most favorable to the State, supported the jury's verdict.

## The Burden of Proof Instruction

K.S.A. 21-3109 states, in part, that "[a] defendant is presumed to be innocent until the contrary is proved. When there is rea-

sonable doubt as to his guilt, he must be acquitted." The trial court in the case at bar gave the following instruction concerning the burden of proof:

"The law places the burden upon the State to prove the defendant is guilty. The law does not require the defendant to prove his innocence. Accordingly, you must assume that the defendant is innocent unless you are convinced from all of the evidence in the case that he is guilty.

"You should evaluate the evidence admitted in this case and determine the innocence or guilt of the defendant entirely in accordance with these instructions. The test you must use is this: If you have a reasonable doubt as to the truth of any of the claims made by the State, you should find the defendant not guilty. If you have no reasonable doubt as to the truth of any of them, you should find the defendant guilty."

Defense counsel approved the instruction and did not object to its use. The clearly erroneous standard of review applies. Waddell contends that it was clearly erroneous for the trial court to have used the word "should" instead of "must" in setting forth the burden of proof.

The "should—must" burden of proof instruction issue is controlled and resolved adversely to Waddell by our recent decisions in *State v. Crawford*, 255 Kan. 47, 872 P.2d 293 (1994); and *State v. Whitaker*, 255 Kan. 113, 872 P.2d 278 (1994). The issue was also discussed and decided adversely to defendant's position in *State v. Johnson*, 255 Kan. 252, 874 P.2d 623 (1994).

Affirmed.