IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 127,162

STATE OF KANSAS,
*Appellee,*

v.

TREMELLE MONTGOMERY,
*Appellant.*

SYLLABUS BY THE COURT

1.

Under K.S.A. 21-5404(a)(2), voluntary manslaughter under an imperfect self-defense theory occurs when an individual knowingly kills a human being upon an unreasonable but honest belief that circumstances existed that justified use of deadly force.

2.

A defendant is entitled to instructions on the law applicable to his or her defense theory, so long as the evidence, when viewed in the light most favorable to the defendant, is sufficient to justify a rational factfinder finding in accordance with that theory.

3.

The trustworthiness of a confession is evaluated by the totality of the circumstances.

4.

The judicial comment error test can be distilled down to two steps: error and prejudice. The error inquiry must be conducted on a case-by-case basis, always informed

by existing caselaw concerning when judicial comments fall outside a permissible latitude. Then, if error is found we must determine whether the error prejudiced the defendant's due process rights to a fair trial.

Appeal from Riley District Court; JOHN BOSCH, judge. Oral argument held September 9, 2025. Opinion filed April 24, 2026. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*David Lowden*, deputy county attorney, argued the cause, and *Barry R. Wilkerson*, county attorney, and *Kris W. Kobach*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

STEGALL, J.:  Early on February 5, 2022, Tremelle Montgomery shot and killed Joshua Wardi on the sidewalk in the Aggieville district of Manhattan, Kansas. This is Montgomery's direct appeal from his convictions for first-degree premeditated murder, as well as three counts of attempted first-degree murder and three counts of aggravated assault. Montgomery alleges his trial was prejudiced by instructional errors and judicial comment errors. Montgomery further argues the State failed to present sufficient evidence to support the convictions for attempted first-degree murder. We affirm Montgomery's convictions.

FACTS AND PROCEDURAL BACKGROUND

Late in the evening of February 4, 2022, Montgomery, who was 19 years old at the time, had been drinking in the Aggieville district of Manhattan. Montgomery began drinking in a parking lot and then went with his friend to Tubby's Sports Bar, an 18 and over bar. Corporal Seth Scobee, of the Riley County Police Department, saw

2

Montgomery in Tubby's and recognized him from an encounter the prior week involving Montgomery and a firearm. At Tubby's, Cpl. Scobee determined that Montgomery was intoxicated, arrested Montgomery, took him to the Aggieville police substation located down the block from Tubby's, and gave Montgomery a citation. This entire sequence was captured on Cpl. Scobee's Axon body camera.

Montgomery was released from the police substation at 12:29 a.m. He immediately went across the street to meet his two friends, Jordan Prather and Edward Wright, who were waiting near Montgomery's car. Montgomery gave his keys to Wright, so as to avoid a potential DUI, and then searched in his car for his cigarettes.

The events resulting in Montgomery's convictions transpired in the next four minutes. Trial testimony regarding the specifics of the events varies slightly, however, the following facts are undisputed.

While Montgomery, Prather, and Wright were across the street from the police substation by Montgomery's car, Wardi, along with three of his friends—Jared Musgrave, Donovan Bastien, and Tyrece White—were leaving Tubby's. Wardi's group began walking down the sidewalk toward White's car and can been seen on camera walking east in front of the police substation. After a few seconds members of Montgomery's group and members of Wardi's group began shouting at each other across the street.

During the shouting, Montgomery believed he heard Wardi's group make threats. Based on this, Montgomery grabbed his extended magazine Glock pistol from his car, tucked it in his front waistband, and started to cross the street toward Wardi's group. None of the members of Wardi's group made any attempt to cross the street or otherwise approach Montgomery's group, and Montgomery did not see anyone else with a weapon.

3

After seeing that Montgomery had a gun, Musgrave, Bastien, and White turned around and ran west. Musgrave and Bastien ran back to Tubby's while White ran down the block, around the corner, and hid underneath a parked car. Wardi also turned around after seeing Montgomery approaching the group, though he only walked back west along the sidewalk. These movements were also captured by cameras in the police substation.

Montgomery continued to cross the street, drew his gun, and approached Wardi, who didn't stop walking. Montgomery claims that Wardi turned around and began to take a few steps toward him. Montgomery never saw Wardi with a weapon, but stated that Wardi's walking made him "anxious." Because he was anxious, Montgomery continued to approach Wardi and proceeded to shoot him five times at close range "until he dropped." Wardi was unarmed.

Because the shooting was only a few feet from the police substation, officers heard the shots and ran outside immediately and observed Wardi lying on the sidewalk. Sergeant Dustin Weiszbrod attempted to render aid to Wardi, while Cpl. Scobee and Officer Wesley Ulmer pursued Montgomery.

Montgomery sprinted west down the sidewalk in the direction of the rest of Wardi's group. He turned the same corner that White had just turned, and officers followed. Security footage from a nearby business showed Montgomery turning the corner, pausing to look around, looking back at the pursuing officers, and then continuing to flee with a gun in his hand. Officer Ulmer ultimately shot Montgomery in the leg and had Montgomery in custody a few seconds after the shooting. While on the ground, Montgomery recognized Cpl. Scobee and said, "What's goin' on dog? It's crazy how quick shit escalated right?"

Montgomery was then taken to Stormont-Vail Hospital in Topeka where he was interviewed by KBI Special Agent Nicholas Krug. During the interview Montgomery

4

said that after he shot Wardi, he ran after Musgrave, Bastien, and White to kill them. Montgomery later testified he was actually running away from members of Wardi's group out of fear of retaliation.

A jury convicted Montgomery of first-degree murder, three counts of attempted first-degree murder, and three counts of aggravated assault. Montgomery was sentenced to life without the possibility of parole for 767 months. On appeal Montgomery argues that (1) the district court erred by finding his requested instructions on self-defense and imperfect self-defense were not factually appropriate; (2) the State presented insufficient evidence to prove the attempted first-degree murder charges; (3) the district court committed two instances of judicial comment error; and (4) cumulative error denied him a fair trial. We consider each in turn.

ANALYSIS

*Imperfect Self-defense and Self-defense Jury Instructions*

At trial, Montgomery requested that the district court instruct the jury on voluntary manslaughter based on imperfect self-defense under K.S.A. 21-5404(a)(2). The State objected to the instruction, arguing it was not factually appropriate. Montgomery also requested, and the State objected to, an instruction for self-defense under K.S.A. 21-5222(b). Ultimately, the district court found that neither of these instructions were factually appropriate and declined to give them.

Our standard of review for challenges to jury instructions is well settled. When an appellant raises a jury instruction issue on appeal:

"(1) First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review;

5

(2) next, the court should use an unlimited review to determine whether the instruction was legally appropriate; (3) then, the court should determine whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and (4) finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in [*State v.*] *Ward*[, 292 Kan. 541, 565, 256 P.3d 801 (2011)]." *State v. Plummer*, 295 Kan. 156, 163, 283 P.3d 202 (2012).

See also *State v. Bobian*, 321 Kan. 169, 174-75, 574 P.3d 385 (2025).

Both parties correctly acknowledge that both self-defense and imperfect self-defense instructions would have been legally appropriate. See *State v. Seba*, 305 Kan. 185, 208, 380 P.3d 209 (2016) ("Imperfect self-defense voluntary manslaughter . . . is a lesser included offense of first-degree intentional murder."); *State v. Haygood*, 308 Kan. 1387, 1404, 430 P.3d 11 (2018) (self-defense instruction legally appropriate as an affirmative defense to first-degree premeditated murder). Therefore, the relevant question before us is whether the instructions would have been factually appropriate.

When evaluating whether a lesser included instruction is factually appropriate, courts use the following test: "Is there some evidence when viewed in the light most favorable to the defendant that would allow a rational factfinder to find the defendant guilty of the lesser included offense?" *State v. McLinn*, 307 Kan. 307, 324-25, 409 P.3d 1 (2018); see K.S.A. 22-3414(3). This "some evidence" standard is not a high bar. See *State v. Maestas*, 298 Kan. 765, 779, 316 P.3d 724 (2014) ("[E]vidence need not be strong or conclusive to warrant the [lesser included offense] instruction."). In some cases, "a defendant's statements may be sufficient by themselves to require issuing a lesser included offense instruction." *State v. Qualls*, 297 Kan. 61, 70, 298 P.3d 311 (2013).

*Imperfect Self-defense (Voluntary Manslaughter)*

"Under K.S.A. 21-5404(a)(2), voluntary manslaughter under an imperfect self-defense theory occurs when an individual knowingly kills a human being 'upon an unreasonable but honest belief that circumstances existed that justified use of deadly force.'" *State v. Thille*, 320 Kan. 435, 438, 570 P.3d 18 (2025). See K.S.A. 21-5404(a)(2) ("Voluntary manslaughter is knowingly killing a human being committed . . . upon an unreasonable but honest belief that circumstances existed that justified use of deadly force under K.S.A. 21-5222 . . . ."). K.S.A. 21-5222(b) permits the use of deadly force when "necessary to prevent imminent death or great bodily harm."

Thus our question is whether, when viewed in the light most favorable to Montgomery, the record contains some evidence which would allow a rational factfinder to determine that Montgomery had an unreasonable but honest belief that he needed to use deadly force against Wardi to prevent imminent death or great bodily harm. Because each witness remembers the details differently, an extensive review of the record is necessary to make this determination.

*Musgrave*

Musgrave testified that he had been with Wardi, White, and Bastien in Tubby's shortly before the shooting. Musgrave said that no members of their group knew who Montgomery was and no one had been having any problems at the bar. The group decided to leave because the bar was dead, so they left through the front door and headed east. Within about five steps, Montgomery's group started "hollering" at them. Musgrave couldn't remember exactly what was said, but said the group was saying something like "what you looking at" so his group asked Montgomery's group the same thing. Musgrave was sure that Montgomery's group initiated the yelling. Musgrave said his group initially ignored Montgomery's group and kept walking while they kept hollering. After a few

steps, Wardi yelled something along the lines of "we ain't worried about y'all," "[m]ind your business," and "stay over there." Shortly after, Bastien said "pretty much the same thing" like "stay over there," "we ain't worried about y'all," and "[w]e don't want to be over there with y'all."

The group had been walking toward White's car, but it was parked on the same side of the street as Montgomery's group, so they discussed going into another bar in order to avoid crossing the street. They abandoned this plan when Montgomery started to cross the street. Montgomery continued to yell across the street and started "mirroring" the group's movements across the street. At one point, Wardi asked, "[W]hat did you say?" and Montgomery pulled out a pistol. After seeing the pistol, Musgrave, White, and Bastien took off running back west. Musgrave initially thought Wardi was running with them. Five seconds later, he heard shots.

*Bastien*

Bastien testified that the group left Tubby's and headed east. Bastien said that White saw Montgomery's group trying to get their attention across the street. Bastien was sure that Montgomery's group initiated the yelling. He didn't know what they wanted but said things to them like, "I don't know what y'all keep doing," "I'm going over here," "Y'all doin' too much," "I don't know y'all," "Y'all go ahead," "[K]eep walking," "[Y]'all don't know nothin," and "[S]tay right there." Bastien also remembered White telling him to chill out, so he quit talking. Bastien said that Wardi said a couple of things but had quit talking before Bastien did.

Bastien said these comments were made in response to Montgomery's group threatening them, telling them to keep moving, and that they were pushovers. While this was happening, Montgomery's group was "mirroring" or "tracking" Bastien's group's

8

movements. Bastien said his group kept walking down the sidewalk, and Montgomery came into the street. Bastien saw Montgomery's gun and yelled "strap" and ran back west down the sidewalk. Shortly after he heard shots.

*White*

White testified that he met the group at Tubby's and, because he was parked closer to Tubby's, the group walked east toward his car so that he could give the others a ride to Wardi's Jeep. As the group was walking on the sidewalk, he heard someone across the street say, "[F]uck you all looking at." They initially ignored them and kept walking. Because it was strange, White immediately called a friend and mentor.

Because White had arrived at Tubby's late, he had seen Montgomery's earlier arrest. When Montgomery's group was yelling, White recognized Montgomery from his red hoodie. White stated that he later figured out that Wright was the member of Montgomery's group who initially yelled at his group.

A few moments later, White heard someone in Montgomery's group yell "keep walking, keep walking . . . yeah, keep on walking because we got something for y'all bitch asses." White said that he responded in kind by saying "we have something for y'all bitch asses." White then said all three of the members of Montgomery's group started saying this. Bastien also said "wait right here[, w]e got something for you," in response.

White then saw Montgomery reach in the car and grab something. White told Bastien to "shut the fuck up" and they kept walking. Then members of Montgomery's group broke off and started approaching White's group from different directions, with Montgomery crossing the road, and cutting the group off. He saw Montgomery pull up

his shirt to show a gun with an extended clip in his waist, so they turned and ran east. Montgomery's group then said "oh, we see y'all are running now." White ran toward Wardi's car, hid under a parked truck, and heard shots.

*Rivera, Baker, and Schiesser*

John Rosario-Rivera was working at a bar in Aggieville at the time of the shooting. Rivera testified that he saw the shooting through the front window of the bar. Rivera testified that he never saw Wardi pull a weapon, throw a punch, or make any move that looked like an attack. He said that Montgomery pulled his gun and it looked like Wardi was trying to calm him down. Montgomery was to the east of Wardi. As part of that, Wardi had his hands up trying to get Montgomery to stop moving, and Montgomery "just shot him." Rivera stated that initially neither person was moving, "but when the shooter pulled out his gun he approached the individual closer."

Sonjay Baker was also working with Rivera. While he didn't see Montgomery shoot Wardi, he heard the shots and saw Wardi fall. Baker testified that it appeared Wardi's hands were up.

Tavin Schiesser was a bystander who saw the shooting. He said that he saw an altercation between two men across the street that appeared to be escalating, and that the shooter said "all right," quickly pulled his gun, and started shooting. Schiesser said that the shooter was further east than Wardi, but Wardi was facing east when he was shot. Schiesser said Wardi never raised a fist or had a weapon. Wardi just turned around and got shot. Schiesser said the whole situation "could have [been] resolved . . . with a punch," but that Wardi fell to the ground and Montgomery kept shooting.

*Montgomery*

For his part, Montgomery testified that he had been by his car, talking to his friends when he heard an argument going on. He saw three individuals standing at the edge of the sidewalk across the street. He also stated that the group was walking east, and continued to walk east during the argument. He stated that he never "tracked" Wardi's group, and instead they stopped just east of the police station to continue to argue.

As the groups were yelling back and forth, he reached for his gun and went across the street to ask what the problem was and to get Wardi's group to calm down. He showed his gun to let Wardi's group know he could protect himself in case anything escalated. He never saw any member of Wardi's group with a gun.

He was especially nervous because he had heard someone say "wait right there" or "wait right here" or "stay right there." He believed this statement meant members of Wardi's group were going to "come back and do something" which most of the time meant to shoot. He testified that no members of his group ever said, "[W]e got something for you."

He said when Wardi's group saw his gun, three of them ran off and Wardi "walked off for a little bit and then he started back approaching" him. However, Montgomery couldn't explain how Wardi had time to get as far west as he had if he had doubled back to approach Montgomery. Montgomery didn't know what to think at that point, but he was anxious and scared. He didn't know if Wardi was armed, but they started arguing. Montgomery couldn't remember what was said, but stated that he didn't approach Wardi any further.

Montgomery said that he pulled his gun and Wardi kept walking toward him, so he fired multiple times. When specifically asked whether Wardi looked like he was going to shoot toward him, Montgomery said, "No, he just walk[ed] towards me." To Montgomery this meant that Wardi was going to try to use his own firearm against him or he had some "intentions in general." The last question asked was, "So, Josh Wardi loses his life because you're anxious?" to which Montgomery responded, "Yes, sir."

*In the Light Most Favorable to Montgomery*

A defendant is entitled to instructions on the law applicable to his or her defense theory, so long as the evidence when viewed in the light most favorable to him or her is sufficient to justify a rational factfinder finding in accordance with that theory. *State v. Anderson*, 287 Kan. 325, 334, 197 P.3d 409 (2008). This is true even if Montgomery's defense theory is only supported by his own testimony. *Qualls*, 297 Kan. at 71. Montgomery stated at multiple points in time that he believed Wardi was a threat to his life. The record shows that the perceived verbal death threat in combination with Wardi's walking *may* have created an unreasonable belief that Wardi was intending to harm Montgomery.

But Montgomery's own trial testimony makes it difficult to determine whether Montgomery honestly had such a belief. Montgomery didn't know what the argument was about, didn't know who had said "stay right there," never saw Wardi have a weapon or attempt to fight him, didn't know what Wardi was going to do—but pursued him, and couldn't explain how his story and certain details could be reconciled with the video evidence. Nevertheless, we will assume without deciding that the district court erred by failing to give Montgomery the requested instruction on imperfect self-defense.

12

Because Montgomery properly preserved his objections to the district court's denial of the imperfect self-defense instruction, we consider whether any error was harmless. We conclude any such error was certainly harmless.

Normally, any preserved jury instruction error is reversible if we find "a 'reasonable probability that the error will or did affect the outcome of the trial in light of the entire record.'" *Plummer*, 295 Kan. at 168. However, Montgomery frames the district court's decision as a denial of his constitutional right to present his theory of defense and thus argues that a constitutional harmlessness framework ought to apply.

As we will explain below, Montgomery has correctly identified a judicial comment error. Under our cumulative error framework, "[i]f any of the errors being aggregated are constitutional in nature"—such as judicial comment errors—"the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome." *State v. Mendez*, 319 Kan. 718, 741, 559 P.3d 792 (2024). See *State v. Boothby*, 310 Kan. 619, 620, 448 P.3d 416 (2019) (judicial comment errors evaluated for constitutional harmlessness). Thus, the constitutional harmlessness standard is appropriate. See, e.g., *Bobian*, 321 Kan. at 175.

When an error infringes upon a party's federal constitutional right, a court will declare a constitutional error harmless only when the party benefiting from the error persuades the court "beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, proves there is no reasonable possibility that the error affected the verdict." *State v. Ward*, 292 Kan. 541, 569, 256 P.3d 801 (2011) (citing *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705, *reh. denied* 386 U.S. 987 [1967]).

Even considering only Montgomery's testimony, the district court's failure to give self-defense instructions is harmless. Montgomery's story does not paint Wardi as being anywhere near using or threatening any "imminent death or great bodily harm." K.S.A. 21-5222(b). Even in Montgomery's own story, Montgomery initially approached Wardi from across the street, while Wardi was walking westward down the sidewalk. Montgomery didn't know what Wardi would do, instead he shot him because he was "anxious."

Considering more than just Montgomery's testimony, Musgrave, Bastien, and White each testified that Montgomery's group had started the yelling—and even yelled "we got something for y'all" first. None of these three victims believed "stay over there" was a death threat, rather it was an instruction that Montgomery completely ignored. All four people in the victim's group turned around and headed the other way once they saw Montgomery's gun. Three of them sprinted away from the scene, while Wardi walked away. Most of these events are corroborated by Axon video evidence. Once Montgomery got within arms' length of Wardi, The Hi Lo bar staff testified that Wardi put his hands up. A passerby testified that whatever was going on "could have [been] resolved . . . with a punch." After Wardi put his hands up, Montgomery said "all right" and shot Wardi five times before sprinting west—in the direction of Musgrave, Bastien, and White.

Therefore, in light of the entire record, there is no reasonable probability that the district court's failure to include an instruction for imperfect self-defense had any impact on the verdict. The evidence is overwhelming that Montgomery approached Wardi, who was unarmed, from across the street—who, after seeing Montgomery's gun, had turned around and began walking in the opposite direction. Montgomery continued to approach Wardi from across the street, confronted him, and shot him five times at close range. We are convinced that no rational juror would have believed Montgomery acted out of an honest but unreasonable belief that deadly force was necessary. Stated another way, we are firmly convinced that, regardless of whether the district court had included an

14

imperfect self-defense instruction, no rational juror would have convicted Montgomery of anything other than first-degree premeditated murder. See generally *State v. Willis*, 319 Kan. 663, 672, 557 P.3d 424 (2024) ("[W]e have considered the record as a whole, including the video recording of the events of the shooting, the testimony of the many witnesses who were present at the time of the shooting, and account that [defendant] gave of what he did and why he did it, and we are not firmly convinced that the jury would have reached a different verdict if the manslaughter instructions had been given.").

*Self-defense*

Montgomery also requested an instruction on the affirmative defense of self-defense under K.S.A. 21-5222. The district court denied that request and Montgomery properly preserved his objection. As previously noted, the parties agree the instruction would have been legally appropriate. Therefore, the question before us is whether the district court erred by determining an instruction on self-defense was not factually appropriate. We determine the district court did not err.

Under K.S.A. 21-5222, a person is justified in using deadly force in self-defense when:

> "(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

> "(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."

Thus, self-defense has two tests: "(1) the subjective test requires a showing that a defendant 'sincerely and honestly believed it was necessary to kill to defend' themselves; and (2) the objective test requires a showing that a reasonable person in the defendant's "'circumstances would have perceived the use of deadly force in self-defense as necessary.'"" *State v. Harris*, 313 Kan. 579, 592, 486 P.3d 576 (2021) (quoting *State v. Haygood*, 308 Kan. 1387, 1405, 430 P.3d 11 [2018]).

Under K.S.A. 21-5108(c):

"A defendant is entitled to an instruction on every affirmative defense that is supported by competent evidence. Competent evidence is that which could allow a rational fact finder to reasonably conclude that the defense applies. Once the defendant satisfies the burden of producing such evidence, the state has the burden of disproving the defense beyond a reasonable doubt."

Therefore, the question is whether a self-defense instruction would have been supported by competent evidence. To evaluate the objective prong of the self-defense statute we must ask whether a reasonable factfinder could find that Wardi posed an imminent threat of death or great bodily harm to Montgomery.

No evidence shows that a reasonable person would have interpreted Wardi's actions as being an aggressor to the point of becoming an imminent threat of death to Montgomery. Wardi walked in the same direction his friends ran as they were fleeing, made no attempt to cross the street, was unarmed, and never reached for a gun. Wardi had told Montgomery to stay away from his group and to not cross the street—the exact opposite of what Montgomery did. The district court was correct when it determined that "objectively . . . no reasonable person could have thought they needed to pull a gun." Compare *State v. Qualls*, 309 Kan. 553, 560, 439 P.3d 301 (2019) (refusal to give self-defense instruction was not harmless when "a reasonable person, under the described

16

circumstances, might have believed a gun was soon coming into play"). Consequently, the district court's decision to not give a self-defense instruction was not error.

*The State presented sufficient evidence to prove the corpus delicti of the three counts of attempted murder.*

Montgomery argues, for the first time on appeal, that the State failed to prove the corpus delicti—"the body of the crime"—for each attempted murder charge. Montgomery argues that the only evidence showing that he was chasing Musgrave, Bastien, and White with an intent to shoot them was his hospital confession. Montgomery argues that his bald confession does not meet the "trustworthiness" standard adopted by the court in *State v. Dern*, 303 Kan. 384, 407, 362 P.3d 566 (2015).

The "trustworthiness" standard means that "an 'uncorroborated extrajudicial confession is insufficient to sustain a conviction.'" 303 Kan. at 409-10 (quoting *State v. Tillery*, 227 Kan. 342, Syl. ¶ 2, 606 P.2d 1031 [1980]). Corroborating evidence "'need not be sufficient, independent of the statements, to establish the corpus delicti.'" *Dern*, 303 Kan. at 406 (quoting *Opper v. United States*, 348 U.S. 84, 93, 75 S. Ct. 158, 99 L. Ed. 101 [1954]). Trustworthiness of a confession is evaluated by the totality of the circumstances. *Dern*, 303 Kan. at 410. The court in *Dern* provided a nonexclusive list of factors indicating the reliability of a confession:

> "(1) independent corroboration of details or specific facts contained in the confession; (2) the number of times the confession was made and the consistency or lack thereof between different versions of the confession; (3) the circumstances of the confession, including the identity of the person or persons to whom the confession was made and the state of mind of the defendant at the time of the confession; (4) the availability of the facts or details contained in the confession from sources outside the defendant's personal knowledge; (5) the defendant's age, education, experience, and mental health; and, (6) if

17

the confession was made to law enforcement, then the overall fairness of the exchange including whether there was deception, trickery, undue pressure, or excessive length." 303 Kan. at 410-11.

Importantly, the *Dern* court also clarified that any one single factor may be significant enough to establish trustworthiness. 303 Kan. at 412 ("In this case, we need not pursue the analysis of trustworthiness beyond the first and most significant factor we have identified—independent corroboration of the facts of the confession.").

> "The evidentiary standard for finding a confession or admission sufficiently trustworthy to satisfy the State's obligation to present a prima facie showing of the corpus delicti is akin to the standard of review applicable to sufficiency of the evidence claims—*i.e.*, it asks whether, viewed in the light most favorable to the prosecution, the totality of the circumstances is such that a rational factfinder could, considering all of the evidence, find beyond a reasonable doubt that the charged crime actually occurred. See [*State v.*] *Cardwell*, 90 Kan. [606,] 608[, 135 P. 597 (1913)] (applying a sufficiency of the evidence standard). It must be noted that the State carries a higher burden when establishing the corpus delicti through a trustworthy confession than it otherwise would if establishing the corpus delicti through the traditional means of evidence entirely independent of the defendant's statements. See, *e.g.*, *State v. Waddell*, 255 Kan. 424, 433, 874 P.2d 651 (1994) (When applying the formal corpus delicti rule, the State's burden is met if 'there is some evidence which renders the corpus delicti more probable than it would be without the evidence.') (quoting *State v. Bradford*, 254 Kan. 133, 139, 864 P.2d 680 [1993])." *Dern*, 303 Kan. at 411.

Montgomery's corpus delicti argument fits within the rule. The attempted murders did not result in any physical injuries. "There being no proof of any crime, the crime is deemed to be imaginary." 303 Kan. at 404. Further, the only direct evidence in the record that Montgomery committed attempted murder was his own confession while being interviewed by S.A. Krug in the hospital.

During the interview, Montgomery mentioned three separate times that he took off running in order to kill the other three members of Jordan's group. Montgomery contradicted these statements at trial by testifying that he was running to *get away* from the other three because he was afraid of potential retaliation. In both accounts, Montgomery denied realizing that he was being pursued by police until after he was shot.

Therefore, the legal question is, when viewed in the light most favorable to the State, whether the totality of the circumstances is such that a rational factfinder could, considering all the evidence, find beyond a reasonable doubt that Montgomery committed attempted first-degree murder. In order to make that finding, the jury would have needed to find that Montgomery: (1) "performed an overt act toward the commission of first-degree murder," (2) "did so with the intent to commit first degree murder," and (3) "failed to complete commission of first-degree murder."

Refined further, the question is whether there is sufficient corroborating evidence of Montgomery's hospital confession—that when combined with that confession and viewed in the light most favorable to the State, would allow a rational factfinder to find that Montgomery was actually chasing down Musgrave, Bastien, and White with an intent to kill them.

Montgomery demands that the court consider all of the factors outlined in *Dern*. Montgomery argues that he was intoxicated on alcohol and painkillers, that the timing of the interview was coercive and outside of KBI protocol, beginning at 5:03 a.m., that Montgomery doesn't remember doing the interview, and that law enforcement forced him to answer in order to get medical treatment. While he attacks the confession as unreliable under the *Dern* framework, he does not contend that it violated his constitutional rights. Not only does Montgomery seem to ignore the phrase "light most favorable to the prosecution"—he likewise ignores the reality of the record.

First, Montgomery had a BAC of .119 at midnight when he received his ticket for minor in consumption. The hospital interview was approximately four and a half hours later and we do not know his BAC at that time. Montgomery had been given fentanyl as a painkiller in the hospital. However, the district court denied a voluntary intoxication instruction and Montgomery didn't appeal that ruling because the court found Montgomery's memory of the events to be clear. An officer in the ambulance stated that Montgomery did not appear overly intoxicated and made specific and clear voluntary requests to contact his supervisor. Montgomery's responses during the hospital interview—which was voluntary and conducted after obtaining a full *Miranda* waiver—were clear, detailed, internally consistent, and thought out.

Next, while the defense did ask KBI agents whether it was normal to wait two full sleep cycles before interviewing someone involved with an officer shooting—the KBI agent was clear that the policy is for *officers* and wasn't aware of that policy ever applying to witnesses. Montgomery was not being coerced via withheld medical treatment—agents even took a brief break to allow the doctor to work with him. The interview lasted less than 25 minutes. There are no indicia of unreliability attached to the interview itself.

Turning to corroborating evidence—the State argues several points. Montgomery was caught on video running in the same direction and turning the same corner as White. White broke off and hid under a car after he saw Montgomery turn the corner behind him. This chase is mostly visible on security footage from the area. Once Montgomery turned the same corner, he pauses and looks around before taking off again—gun in hand. Premeditation and intent are shown by Montgomery retrieving his gun from his car, crossing the street toward the group, and shooting one of them five times. Montgomery did not immediately go to the police substation a few feet away after shooting Wardi— even though he stated he was concerned about retaliation and relieved when he was taken down by officers. Instead, he took off *in the direction* of those he was "scared of."

20

From these facts, it is reasonable to conclude and infer that if Montgomery was willing to cross the road and shoot Wardi with premeditation and the intent to kill, that Montgomery's decision to pursue the other three victims was also done with the same intent and state of mind. There is no difficulty concluding that, considering the totality of circumstances viewed in the light most favorable to the prosecution, Montgomery's confessions were supported by sufficient indicia of reliability to permit the corpus delicti of the charged crime to be shown through those statements.

*Judicial Comment Error*

Montgomery next argues the district court committed two judicial comment errors. First, Montgomery argues the district court erred by informing the jury of the penalty for premeditated murder. Second, Montgomery argues that the district court improperly instructed the jury to return a verdict of guilty if the State met its burden of proof.

Appellate courts apply a de novo standard when reviewing potentially erroneous judicial comments that are not jury instructions or legal rulings. See *State v. Blevins*, 313 Kan. 413, 423, 485 P.3d 1175 (2021). The judicial comment error test can be distilled down to two steps: error and prejudice. The error inquiry must be conducted on a case-by-case basis, always informed by existing caselaw concerning when judicial comments fall outside a permissible latitude. Then, if error is found we must "'determine whether the error prejudiced the defendant's due process rights to a fair trial.'" *Boothby*, 310 Kan. at 626.

Once judicial comment error has been found, courts apply the constitutional harmlessness test articulated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The party benefiting from judicial comment error has the burden to

prove beyond a reasonable doubt that the error complained of will not or did not affect the trial's outcome in light of the entire record. In other words, the party must show there is no reasonable possibility that the error affected the verdict. *Blevins*, 313 Kan. at 423.

*Mention of the Maximum Sentence for Premeditated Murder*

During voir dire, a juror informed the court that, because of their religion, they could not serve as a juror on a capital murder case. The judge responded that this was not a death penalty case and the maximum sentence in this case was life in prison. This exchange is excerpted below:

"JUROR NO 18:  Your Honor, I don't know if this applies, but I'm Roman Catholic. I'm morally against the death penalty. If that was something that was pursued then I don't feel that I could morally deliver a guilty verdict.

"THE COURT:  Very well. Well, [Juror], this case has not been filed as what's called a capital murder case where the death penalty is in play. The death penalty is not in play in this case *and so the penalty is life in imprisonment but not capital punishment*. So, sir—

"MR. MUTH [State's counsel]:  Judge, can we approach?

"THE COURT:  Yes.

"(The following proceedings were had in chambers, the defendant being present.)

"THE COURT:  We're now in chambers out of hearing of the jury—the jury panel. Present in court is Mr.—or present in chambers is Mr. Montgomery; both counsel, Ms. Ingels, Ms. Jordan; Mr. Muth and Mr. Griffin. Mr. Muth?

"MR. MUTH:  Judge, I took issue with the fact the Court's telling the jury what disposition is going to be and the jury is not supposed to—other than the death penalty

22

case, the jury is not supposed to consider that whatsoever. The only time that it comes in is if the State were to take a deal with somebody and they avoid a life sentence and the defense can bring it up at that point to show the benefit that somebody got but—and I know Ms. Jordan and Ms. Ingels were both—when you made that statement, were both thinking the exact same thing. We all looked at each other. I don't know what the curative of measure is at this point other than maybe telling the jury that they are not to consider the disposition whatsoever and actually going to be a jury instruction that says that, but I would ask that all parties refrain from discussing what the potential disposition is because the jury shouldn't be making decisions based on sympathy or not making decisions based on what they think may happen.

"MS. INGELS [defense counsel]:  Your Honor, I agree with Mr. Muth. The jury is not supposed to know what the possible penalty other than it's not a death penalty case. *So, I think the curative is that Your Honor needs to give an instruction basically explaining they are not to take that—they're not to consider the possible sentence or anything of that nature.*

"THE COURT:  Very well. We will go back in court.

"MR. MUTH:  Thanks, Judge.

. . . .

"(All parties returned to the courtroom.)

"THE COURT:  We're back on the record. This is Riley County Case 22-CR-53. State of Kansas, represented by Mr. Muth and Mr. Griffin, v. Tremelle Montgomery, who is present with his counsel, [Ms.] Ingels and [Ms.] Jordan. We just returned to the courtroom after counsel requested that we address the matter, and the matter has to do with your question, [Juror], regarding the potential for capital punishment.

"And *what I'm going to do is just read you an instruction that I give to the jury once the jury is instructed in the law and the evidence that is concluded and the instruction is this—it's Instruction No. 3 in my list of instructions and it's this, your only*

23

*concern in this case is determining whether the defendant is guilty or not guilty. The disposition of the case thereafter is a matter for determination by the Court. So, you and everyone else should not be concerned regarding the disposition of the case after your verdict because that's a matter for determination by the Court.*

"[*Juror*]*, did I answer your question sufficiently, sir?*

"[JUROR]:  Yes, Your Honor.

"THE COURT:  With that said, sir, do you have any problem proceeding to serve as a juror if you were selected to serve as a juror today?

"[JUROR]:  I believe I could issue a verdict guilty or not guilty, but I do believe it's everyone's—I believe it's a morally correct thing to consider of the outcome of what that impact of that decision has. And so that would be on my mind.

"THE COURT:  Very well.

"[JUROR]:  I can proceed further if you'd like to.

"THE COURT:  I think that's good enough, sir. Thank you very much. Please have a seat." (Emphases added.)

As is clear from the record, both parties immediately objected and then proceeded to have an in-chambers discussion with the judge. Counsel for both parties specifically agreed that the judge should take the corrective action of reading Instruction No. 3 to the jurors. Even though no further objection was made from either party no objection is required to preserve the issue for appellate review. See *Boothby*, 310 Kan. at 628 ("'[W]hen a defendant's right to a fair trial is alleged to have been violated, the judicial comments are reviewable on appeal despite the lack of a contemporaneous objection.'"). See also *Blevins*, 313 Kan. at 423 (rejecting the State's invitation to revisit *Boothby*'s preservation holding).

24

The first step in a judicial comment error analysis is to determine if the judicial comment was, in fact, error. The parties agree with the general rule that "'juries should not consider the ultimate disposition of the case.'" *State v. Lowery*, 308 Kan. 1183, 1229, 427 P.3d 865 (2018) (quoting *State v. Yardley*, 267 Kan. 37, 42, 978 P.2d 886 [1999]). "Therefore, in arriving at a verdict in the guilt stage of the trial, the jury should not [be] concerned with the potential penalty for first-degree murder." *Lowery*, 308 Kan. at 1229.

The State acknowledges that the court's comment may be erroneous. The State is correct. "The jury should not have heard the information about the possible sentence that would be imposed if it found the defendant guilty." 308 Kan. at 1229-30; see also PIK Crim. 4th 50.080 (2015 Supp.) ("Your only concern in this case is determining if the defendant is guilty or not guilty. The disposition of the case thereafter is not to be considered in arriving at your verdict."). Because the judge's comment actually informed the jury that life imprisonment would be a potential penalty, this comment was error.

The second step in judicial comment error analysis is to evaluate the error under the constitutional harmlessness standard, i.e., whether the State has proven beyond a reasonable doubt that the comment did not affect the trial's outcome in light of the entire record. *Blevins*, 313 Kan. at 423.

Here, the State immediately objected to the court's comment and the parties discussed a jury admonition in the form of a curative instruction. That instruction (Instruction No. 3) ultimately was agreed to by both parties and matches the language of the PIK instruction. The jury was then instructed that it was not to consider the ultimate disposition in this case, and we presume that the jury followed the instructions given. See *State v. Rhoiney*, 314 Kan. 497, 501, 501 P.3d 368 (2021) (presuming that jurors follow the court's instruction to disregard an erroneous statement made by prosecutor); *Lowery*,

25

308 Kan. at 1243-44 (finding the district court's refusal to redact video which included law enforcement's references to a hard 50 sentence harmless); *State v. Mitchell*, 294 Kan. 469, 482, 275 P.3d 905 (2012) ("[W]e presume the jury follows the instructions given.").

Montgomery argues that this comment caused the jurors not to effectively deliberate on charges 2-7, because if they believed Montgomery would be in prison for life, "why would they thoroughly deliberate the remaining charges?" Montgomery argues that this "who cares" attitude contributed to Montgomery's other convictions.

Montgomery's argument is logically flawed. Simply put, Montgomery's argument is that the jury didn't care enough about the sentences for counts 2-7. Such an argument must fail because the jury's job is strictly to determine questions of fact—*not* to care about the ultimate disposition of the case. See K.S.A. 22-3403(3) ("When the trial is to a jury, questions of law shall be decided by the court and issues of fact shall be determined by the jury.").

We fail to see any connection between the court's comment and any of Montgomery's convictions. It is not reasonable for this court to assume that the jury disregarded the jury instructions and made its decision on the court's comment rather than basing its verdict on the evidence and instructions. Consequently, the State has proven beyond a reasonable doubt that the comment did not affect the trial's outcome in light of the entire record.

*The court's statement regarding the jury's duty to render a verdict was an accurate statement of the law.*

Montgomery argues the court erred by stating the following during voir dire:

26

"At the conclusion of the trial you will be asked to render a verdict. At that time I will instruct you that the State has the burden to show that the defendant committed the crimes for which he's been charged. If you the jury conclude that the State has met that burden of proof beyond a reasonable doubt, *I will instruct you to* return a verdict of guilty." (Emphasis added.)

"Judicial comments, by definition, are judicial statements made in front of a jury which are not instructions or legal rulings." *State v. Hollins*, 320 Kan. 240, 241, 564 P.3d 778 (2025). However, in context, the judge was explaining, prospectively, what was going to happen in order to help the jurors understand their task. The judge was not technically "instructing" the jury when he made this comment.

Montgomery specifically argues the court's use of the phrase "*I will* instruct you to return a verdict of guilty" was erroneous because it approaches "directing a verdict for the State." (Emphasis added.) Instead, Montgomery argues that the court erred by not using the precise language of Instruction No. 4, which matches PIK Crim. 4th 51.010 (2024 Supp.) and states in relevant part: "If you have no reasonable doubt as to the truth of each of the claims required to be proved by the State, *you should* find the defendant guilty." (Emphasis added.) In making his argument, Montgomery references cases dealing with instructional errors.

In Montgomery's case, the comment was not an instruction—and the judge was not "directing" the jury to do anything, let alone "directing a verdict." A "'judge cannot compel a jury to convict, even if it finds all elements proved beyond a reasonable doubt.'" *State v. Pruitt*, 310 Kan. 952, 967, 453 P.3d 313 (2019). But here the judge did not seek to compel anything. The judge's comment informed the jury of what *the judge* was going to do—"*I will* instruct you to return a verdict of guilty." (Emphasis added.) Which is, in fact, what the judge did by later giving jury Instruction No. 4. The judge's comment in Montgomery's case didn't "direct" the jury to do anything—it was a prospective

27

statement, not a call to action. We are further unpersuaded that the statement was anything other than an accurate statement of the law. Compare *State v. Lovelace*, 227 Kan. 348, 607 P.2d 49 (1980) (instruction telling jurors "you must" find the defendant guilty was erroneous). Therefore, we do not find this comment to be erroneous.

*Cumulative error did not deny Montgomery a fair trial.*

> "Cumulative trial errors, when considered together, may require the defendant's conviction to be reversed when the totality of the circumstances establishes that the defendant was substantially prejudiced by the errors and denied a fair trial. In assessing the cumulative effect of errors during the trial, appellate courts examine the errors in context and consider how the trial judge dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. If any of the errors being aggregated are constitutional in nature, the party benefitting from the error must establish beyond a reasonable doubt that the cumulative effect did not affect the outcome." *State v. Zongker*, 319 Kan. 411, 433, 555 P.3d 698 (2024).

We have assumed one error and found another: (1) the district court's failure to give an instruction for voluntary manslaughter based on the theory of imperfect self-defense; and (2) the judicial comment mentioning the potential life sentence for premeditated murder. Each of these errors were individually harmless under the constitutional standard. When considered together, the cumulative impact of those errors is also harmless. The record contains an overwhelming amount of evidence that Montgomery did not shoot Wardi because of an honest and unreasonable belief that shooting him was necessary. This error is of a different nature than the judge's comment informing the jury that Montgomery may receive a life sentence. The erroneous judicial comment has no bearing on any of the substantive facts of the case, nor does it relate at all to Montgomery's defense. The comment was immediately flagged and a curative

28

instruction was given. We are convinced that these two unrelated harmless errors, considered together, did not affect the outcome of Montgomery's trial in light of the entire record.

Affirmed.

LUCKERT, J., not participating.